# FRANK E. BRADFORD et al., Appellants, v. HOWARD A. BLOSSOM et al.

## In Banc, November 27, 1907.

1. **WILL: Not Expressive of Testator's Intention.** A will that does not dispose of her property as testatrix desired and directed, cannot stand.

2. ————: ————: **Shaped by Agent.** If the old and deaf and frail but unusually bright and intelligent testatrix directed her agent to have her will drawn in one way and he had it drawn in another, and she signed it under the belief that it was written as she had directed, it was not her will.

3. ————: ————: ————: **Opportunity to Read and Understand.** Testatrix, a widow, old in years, small of body, almost deaf, had been weak and frail for years, was subject to exhaustion or sinking spells which increased in number and severity from year to year and while they lasted she was wholly incapacitated to transact business, but at all other times she was capable of transacting her business in an intelligent and business-like manner and was unusually bright and intelligent and possessed of a strong will. Her confidential agent came to her house and she directed him that she wanted her will so drawn as to vest her property in him as trustee and so that her children would have the net income during their lives and after their deaths the corpus was to go in fee simple to their children, if any, and if either died without children and the other had children living that moiety was to go to such other's children, and if both died without children the corpus was to go in equal parts to her own and her husband's next of kin. The agent at the time made memoranda of her directions and turned these over to a lawyer, who drew a complicated will in accordance therewith, inserting a spendthrift trust, and making the agent trustee, and fully explained its provisions and meaning to him, who said it was satisfactory to him, and he mailed it to testatrix, who a week or ten days later came with the agent to the lawyer's office and signed it and it was witnessed by the lawyer and his stenographer. There was no evidence that she ever read it or that it was ever explained to her, or that the memoranda were read by or explained to her. At the time she had a married daughter, whose husband was a spendthrift and who then had one child and now has four,

207 Sup.—12

and an unmarried son of intemperate habits and afflicted with epilepsy. The will as written gave her children so much of the net annual income as the trustee might see proper to pay them; if either died, it gave to his or her children the net income of that moiety during their minority only, and postponed the vesting of the estate in them until the youngest should reach twenty-one years, thus giving the others nothing between the time they should reach that age and the time the youngest should reach that age. *Held*, that the will as drawn was not her will, and should be set aside and for naught held.

4. ———: ———: **Mistake as to Meaning.** Where there is no evidence that testatrix had any knowledge of the contents of the will she signed, the rule that a will will not be set aside because of a misconception of its legal meaning and effect (a mistake of law) is inapplicable, for it has nothing to rest upon.

5. ———: ——— **Pleading.** If the proponents themselves show that the paper does not express the intention and direction of the testator, it is not necessary, in order for it to be set aside, that there be an affirmative allegation to that effect in the petition. The law places upon the proponents the burden of showing that the proposed paper was the testatrix's will.

6. ———: **Explanation: How Far.** Where a relation of trust and confidence existed between the testatrix and the trustee who furnished the memoranda to the lawyer in accordance with which the will was drawn, and an interest in the estate is given thereby to the trustee and his wife, the burden of proof shifts upon him to show that testatrix not only had opportunity to read the will, but that she did read it and understood what disposition it made of her property, and also that she acted freely, from her own volition, and that its execution was not the result of undue influence or fraud practiced upon her.

7. ———: **Change to Perpetuities: Unintended by Testator.** Where testatrix's only intention in placing her property in the hands of a trustee was that her children might have the net income thereof during their lives, the remainder to go to her grandchildren in fee simple, a change, without her knowledge, brought about by the trustee (who was her confidential agent and who furnished the memoranda by which the lawyer was guided in drawing it), by which it was made to be in conflict with the law against perpetuities, rendered it invalid, since it was not the will she intended to make.

8. ——: **Perpetuities.** If contestants desire to have a will set aside on the sole ground that it is in violation of the law against perpetuities, their petition should charge it to be void for that reason.

9. ——:ʹ **Practice: Death of Party After Submission.** Where the contestants appealed from the judgment establishing a will, and after the cause is submitted on appeal the trustee (one of the beneficial proponents) dies, the appellate court, in its decision reversing the judgment, will direct the trial court to enter judgment as of the date of the original judgment.

Appeal from St. Louis City Circuit Court.—*Hon. Warwick Hough*, Judge.

REVERSED AND REMANDED (*with directions*).

*M. F. Hanley, R. P. & C. B. Williams* and *Thomas B. Harvey* for appellants.

(1) Instruction 9 should have been given. The doctrine of this instruction is that if a relation of trust and confidence existed between the testatrix and Blossom at the time of the execution of the will and Blossom received any interest, direct or indirect, in the property bequeathed in the will, then a presumption of undue influence arose and unless such presumption has been overcome by rebutting evidence the finding should be against the will. This is undoubtedly the law, and the refusal of this instruction reversible error. Roberts v. Bartlett, 190 Mo. 699; Bradford v. Blossom, 190 Mo. 110; Garven v. Williams, 44 Mo. 465, 50 Mo. 206; Street v. Goss, 62 Mo. 228; Bradshaw v. Yates, 67 Mo. 228; Harvey v. Sullens, 46 Mo. 147; Carl v. Gabel, 120 Mo. 297; Maddox v. Maddox, 114 Mo. 46; Gay v. Gillilan, 92 Mo. 255; Dingman v. Romine, 141 Mo. 466; Bridewell v. Swank, 84 Mo. 455; Barkley v. Cemetery Assn., 153 Mo. 300; Dausman v. Rankin, 189 Mo. 677; Hegney v. Head, 126 Mo. 619. (2) Instruction 16 was erroneous. This instruction assumes that the will was drawn by mistake. Mr. Thompson distinctly testified

that the will was drawn exactly like he was told to draw it, and this fact was not denied by Blossom. The fatal vice in the instruction is in assuming that a mistake was made in the drafting of the will, and telling the jury that this is no evidence of fraud or undue influence. Again, the belief of Mr. Blossom as to whether the will was drawn like he instructed it to be drawn is made an element in his exoneration. This was clearly erroneous. Hull v. St. Louis, 138 Mo. 618; Linn v. Massillan, 78 Mo. App. 111; Minnier v. Sedalia, 167 Mo. 99. (3) Instruction 1 under the doctrine of the following case clearly should have been given: Cowan v. Shaver, 197 Mo. 203.

*Lehmann & Lehmann* for respondents.

(1) The judgment should not be reversed, because there was no error materially affecting the merits of the action, and the right result was reached. R. S. 1899, sec. 865; Norton v. Paxton, 110 Mo. 456; Barkley v. Cemetery Ass'n, 153 Mo. 300; Moore v. Railroad, 176 Mo. 528; Cass County v. Bank, 157 Mo. 133; Couch v. Eastham, 27 W. Va. 796; Barker v. Commins, 110 Mass. 477; Schouler on Wills, 218, 219. (2) The facts do not create a legal presumption of fraud or influence, and at the most only make an issue to be submitted to the jury for their determination. Barkley v. Cemetery Assn., 153 Mo. 316; Berberet v. Berberet, 131 Mo. 410; Campbell v. Carlisle, 162 Mo. 645; Hughes v. Rader, 183 Mo. 630, 710; Aylward v. Briggs, 145 Mo. 613; Doherty v. Gilmore, 136 Mo. 419; Norton v. Paxton, 110 Mo. 467; McFadin v. Catron, 120 Mo. 275; Carl v. Gabel, 120 Mo. 299; Tibbe v. Kamp, 154 Mo. 582; Jones v. Roberts, 37 Mo. App. 163. (3) The instructions given by the court correctly state the law upon the issues of fraud and undue influence. Hughes v. Rader, 183 Mo. 708; Meyers v. Hauger, 98 Mo. 433; Norton v. Paxton, 110 Mo. 456; McFadin v. Catron, 120 Mo. 252; Riley v. Sherwood, 144

Mo. 354; Martin v. Bowdern, 158 Mo. 379; Campbell v. Carlisle, 162 Mo. 634; Crowson v. Crowson, 172 Mo. 691; Sehr v. Lindemann, 153 Mo. 276; Morton v. Heidorn, 135 Mo. 608.

## STATEMENT.

WOODSON, J.—This is the second appeal of this case to this court. The opinion delivered on the former appeal was written by BURGESS, J., and is reported in 190 Mo. 110. It originated in the circuit court of the city of St. Louis, and was instituted to contest the validity of the last will of Emma. V. Bradford, who departed this life on July 28th, 1898. The will bears date July 21, 1893, and was duly probated in the probate court of the city of St. Louis, on August 8, 1898, and this suit was begun October 10, 1899. The petition for cause of action states that the will was procured to be executed by and through the fraud perpetrated upon and the undue influence exerted over the mind of the testatrix by defendant, Howard Blossom. The pleadings are substantially set forth in the former opinion, which fact obviates the necessity of restating them here.

While the opinion on the former appeal is very ably and carefully considered, yet the many questions now presented are so radically different from those involved on the former hearing that it becomes necessary to restate much of the evidence of the case disclosed by the record, in order that they may be properly understood and intelligently disposed of.

Said will is in words and figures as follows:

"I, Emma Virginia Burns Bradford, widow of the late William E. Bradford, of the city of St. Louis, State of Missouri, being of sound mind and memory and mindful of the uncertainty of life, do by these presents make, publish and declare the following instrument to be my last will and testament hereby expressly revoking all other wills made and published by me.

## "I.

"I declare that I have now living two children: My son, Frank E. Bradford, and my daughter, Carrie Bradford Ryan, wife of Alfred Ryan; that I have no debts or obligations of any character to be allowed against my estate except such as may accrue for my last sickness and funeral, and except such as may be secured on real estate purchased by me, for the deferred payments of the purchase price, for which I have hereinafter made special provisions. And as to all other debts and obligations, I direct my executor named to contest the validity of any claim against my estate which in his opinion is of long standing and supported by doubtful or uncertain evidence.

## "II.

"It is my will that all of my estate, real, personal and mixed, wherever situate, and to which I am entitled either at law or in equity, vested in me in fee simple or otherwise, by virtue of any gift, grant, devise, inheritance, or by virtue of any conveyance made to any trustee or trustees, for my use and benefit, or under any power mentioned in such conveyance, which authorizes me to appoint, dispose or devise by last will and testament or any other conveyance in the nature of a last will and testament, any of such property, real, personal or mixed, I do hereby will, devise and bequeath to my friend Howard A. Blossom.

"To have and to hold the same unto him, the said Howard A. Blossom and to his heirs and assigns forever.

"In trust, however, for the following purposes, to-wit: To deliver to my daughter, Carrie Bradford Ryan, wife of Alfred Ryan, and to my son, Frank E. Bradford, out of my residence such statuary, pictures, laces, jewels, clothing and household goods, of equal value to each of said persons, as they may select; and

if my said son and daughter cannot agree upon the articles to be selected by them then said trustee shall decide in all cases of disagreement and shall deliver such property as herein devised and bequeathed to him to said persons, as he may determine.

"And in further trust, as to all other property owned and possessed by me, or to which I am entitled either at law or in equity, to collect and receive all the rents, issues and profits thereof, and to pay all the taxes, assessments, insurance and repairs, and all other expenses which in the discretion of the said trustee may be deemed proper and expedient to be incurred in holding, managing, controlling and disposing of said property; and to pay out of said income (or the principal, if necessary) so held by said trustees, any sum or sums of money that may be recovered by any action at law or suit in equity against said trustee, by any person or persons, whomsoever, for any damages or injuries sustained by any person or persons by reason of any act done, or the omission of any act, by the said trustee, by which any cause of action for any injury or damage shall result, and for which any person or persons may be entitled to recover against said trustee for such injuries or damages. And from the net income thereof, after the payment of all such sums required herein to be paid by said trustee, to divide the said income into two equal parts; to suffer and permit my son Frank to use and enjoy so much of the one part of the said net income for and during his natural life as my said trustee may deem proper to pay him, such payment to be made to him in such sum or sums and at such time or times as said trustee may determine, paying the same into his own hands and taking his receipt therefor. And from the other part of said income to suffer and permit my daughter Carrie to use and enjoy so much of said part of said net income, for and during her natural life, as my trustee may deem proper to pay

her, such payment or payments to be made to her in such sum or sums and at such time or times as said trustee may determine, paying the same into her hands and taking her receipt therefor.

## "III.

"And in further trust, after the death of the said son Frank, in the event of his marriage and his wife should survive him, to suffer and permit his widow to use and enjoy so much of one-fourth of said net income (i. e., one-half of his share), for and during the period of her natural life, if she shall remain the widow of my son Frank, as my trustee may deem proper to pay her, in such sum and at such times as said trustee may determine, paying the same into her own hands and taking her receipt therefor; and in case of her death or marriage all the share of my said son Frank in such income shall be paid to his child or children as hereinafter mentioned, in the manner hereinafter stated.

"And in further trust, that in case my said son, Frank, shall marry and any child or children shall be born of his body, who shall survive him, to suffer and permit such child or children to use and enjoy so much of one-fourth of said net income (i. e., one-half of his share), for and during the period of the minority of such child or children, as my trustee may deem proper to pay to the lawful guardian of such child or children, in such sums and at such times as said trustee may determine; said payments to be made into the hands of the said guardian or legal custodian of such child or children, or directly to such child or children, if my said trustee may deem such payment proper and expedient, and taking the receipt of such child or children therefor.

"And in further trust, that in case my said son Frank shall die without issue born of his body, leaving a widow, then one-fourth of the net income is to be ad-

ded to the principal and held by the said trustee as herein provided for the disposal of the said principal.

"And in further trust, that in the case of the death of my said son Frank, unmarried, and without issue born of his body, and prior to the death of my daughter Carrie, then I direct my trustee to suffer and permit my daughter Carrie to use and enjoy as much of the said net income for and during her natural life as my said trustee may deem proper to pay her, in such sums and at such times as said trustee may determine, paying the same into her own hands and taking her receipt therefor.

## "IV.

"And in further trust, in case of the death of my said daughter Carrie, leaving a child or children born of her body, to suffer and permit such child or children to use and enjoy so much of said net income as she would be entitled to, if living, for and during their minority as my trustee may deem proper to pay them, or the guardian or custodian of such children, in such sums and at such times as said trustee may determine; said payments to be made in the hands of said guardian or legal custodian, or directly to said child or children, if my said trustee may deem such payment proper and expedient, and taking the receipt of such child or children therefor.

"And in further trust, that if my said daughter Carrie shall die leaving no children or their descendants, or in case of her death any of her children shall not attain the age of twenty-one years and shall die leaving no descendants, and my son Frank shall survive the said daughter Carrie and her said children and their descendants, or my said son Frank shall marry and leave any child or children born of his body surviving him, and after the death of my said daughter Carrie and her descendants and any of her children shall not

attain the age of twenty-one years and shall die leaving no descendants, then my said trustee shall suffer and permit my said son Frank or his child or children, to use and enjoy so much of the entire net income of said estate, for and during their natural lives, as my trustee may deem proper to pay them, in such sums and at such times as said trustee may determine, and paying the same into their own hands and taking their receipt therefor.

"And in further trust, that in case my said son Frank shall die leaving no children or their descendants, or in case of his death any of his children shall not attain the age of twenty-one years and shall die leaving no descendants, and my daughter Carrie shall survive my son Frank and his said children and their descendants, or my said daughter Carrie shall leave any child or children born of her body surviving her, and after the death of my said son Frank and his descendants; and any of his children shall not attain the age of twenty-one years and shall die leaving no descendants, then my said trustee shall suffer and permit my daughter Carrie or her child or children, to use and enjoy so much of the entire net income of said estate, for and during their natural lives, as my trustee may deem proper to pay them, in such sums and at such times as said trustee may determine, and paying the same into their own hands and taking their receipt therefor.

## "V.

"And in further trust, that if my said daughter Carrie shall die leaving a child or children who shall not attain their majority or leave descendants, and in case of the death of my son Frank, unmarried, or if married without children born of his body, or shall die leaving a child or children who shall not attain their majority or leave descendants, then I do will, devise and bequeath to Alfred Bradford and Charles H. Brad-

ford, if they shall then be living, for and during their natural lives, and after the death of Alfred Bradford and Charles H. Bradford to the heirs of Alfred Bradford, a certain lot or parcel of land situate in the city of St. Louis, State of Missouri, being a lot of ground having a front of forty feet on the north line of Washington avenue by a depth of one hundred and twenty-five feet; said lot commencing at a point on the north line of Washington avenue ninety-four feet east of the east line of Sixth street, running thence north and parallel with Sixth street one hundred and twenty-five feet and parallel with Washington avenue forty feet, thence south and parallel with Sixth street one hundred and twenty-five feet, thence west along the north line of Washington avenue forty feet to the point of beginning. To have and to hold the above described premises to the heirs of the said Alfred Bradford, and their assigns forever.

## "VI.

"And in further trust, that if my said daughter Carrie shall die leaving a child or children who shall not attain their majority or leave descendants, and in case of the death of my son Frank, unmarried, or if married without children born of his body, or shall die leaving a child or children who shall not attain their majority or leave descendants, then in trust to convey all the rest, residue and remainder of my estate, real, personal and mixed, including both principal and income interest thereof, to the legal heirs of my two sisters, Mrs. Margaret Burns Mygatt, deceased, late of Vicksburg, Mississippi, and Mrs. Caroline A. Burns Wood, deceased, late of Richmond, Virginia.

"To have and to hold the same unto them, and their heirs and assigns forever.

## "VII.

"And in further trust, that if my said daughter Carrie shall die leaving a child or children, and when

the youngest of such children shall attain the age of twenty-one years, after the death of their said mother, and in case of the death of my said son Frank, leaving a child or children born of his body, and when the youngest of whom shall attain the age of twenty-one years, after the death of their said father, then I direct my said trustee to divide the principal of said estate into two moieties; one of which I direct he shall convey in fee simple to the child or children, or the descendants thereof, of my daughter Carrie, discharged of said trust, and the other moiety I direct said trustee to convey in fee simple to the child or children, or the other descendants thereof, of my son Frank, discharged of said trust.

## "VIII.

"It is my will, and the said trustee is further authorized and empowered that at any time during the life of my son Frank and my daughter Carrie or at any time after the death of either of them and during the existence of the trusts hereinbefore mentioned and set forth, to sell and convey in fee simple, or lease for a term of years, or mortgage, or convey by deed of trust, or otherwise encumber any or all of the real estate held and owned by me, and to invest the proceeds thereof in real estate securities, or in municipal, state or county bonds, for the same uses and trusts and to pay over the income therefrom in the same manner as the rents and income of the real estate and other property are to be paid under the provisions hereof.

"And the said trustee is further authorized and empowered to pledge, hypothecate, mortgage or otherwise encumber any of the real estate herein devised for the purpose of paying off any mortgage or other encumbrance existing upon any of the real estate herein devised, or to sell any of the real estate for the purpose of paying off any encumbrances.

"And the said trustee is hereby authorized to lease, sell and convey in fee simple, or otherwise dispose of any part or portion of any of the property so held by him in trust under the provisions herein, as he may deem expedient, it being left entirely to his discretion when such leases, sales, hypothecations or dispositions of said property shall be made.

## "IX.

"All of the property herein conveyed to the said trustee, including all the rents, income and profits thereof, and which is held by him in trust for the use and benefit of the beneficiaries herein named, shall be disposed of and held by said trustee in the manner herein provided and in no other manner whatsoever and neither my son Frank nor my daughter Carrie, nor their descendants, nor any beneficiaries herein named, shall have any right or power to sell, convey, mortgage, hypothecate or dispose of any interest or right in and to any of the trust property herein held by said trustee or his successor; such disposition is hereby prohibited by any beneficiary in this will.

## "X.

"And in further trust, that whenever the said Howard A. Blossom, trustee named herein of the trusts created by this will, shall become a non-resident of the State of Missouri, or shall desire to resign the said trusts created, he shall have full power and authority, at any time he may so desire, to appoint a new trustee in his place and stead, by an instrument in writing duly signed, sealed and acknowledged by him and recorded in the office of the Recorder of Deeds of the city of St. Louis. And the said Howard A. Blossom shall also have power in his last will and testament to appoint a new trustee in his place and stead, to execute the trusts herein created, in case of his death.

"And in further trust, that if the said Howard

A. Blossom shall resign, or shall die without appointing any trustee as his successor herein, then the Missisippi Valley Trust Company of the city of St. Louis shall become his successor of the trusts herein created.

## "XI.

"In conclusion I do hereby nominate and appoint my friend Howard A. Blossom executor of my will, and I do especially direct that he be authorized and empowered to qualify and perform all the duties required by the laws of the State of Missouri, as such executor, without giving bond to any person or to the state for such duties in said office. And it is my further will that said Howard A. Blossom, as trustee under the trusts herein created, shall perform the duties and obligations of said trusts without being required to give bond to the State of Missouri, or to any beneficiary, or any person for the faithful discharge of his duties as such trustee.

"It is my further will, and I direct and request my executor to finally settle my estate and make distribution thereof as soon as the laws of the state will permit.

"In witness whereof, I have hereunto set my hand and seal this 21st day of July, A. D. 1893.

"(Seal)                         EMMA V. BRADFORD.

"Witnesses:

"SOPHIE C. LOESSLER,

"W. B. THOMPSON.

"We attest the above and foregoing will by subscribing our names hereto as witnesses, in the presence of Emma Virginia Burns Bradford, the testatrix, this 21st day of July, A. D. 1893.

"SOPHIE C. LOESSLER,

"W. B. THOMPSON."

Prior to the execution of the will in controversy, to-wit, 1886, the testatrix duly executed another will. At the time of its execution she was a widow of — years of age and had two children: Frank Bradford, an unmarried son, about thirty years old; and Carrie Ryan, a married daughter, about twenty-seven years old, who at that time had one child, but who now has four. Not having confidence in the financial ability of her daughter's husband, he being a spendthrift, the testatrix, by the will of 1886, devised one-half of her estate to Alfred Bradford and Howard Blossom, in trust, for the benefit of her daughter Carrie for life; that is, the entire net income thereof was to be paid to her semi-annually or annually during her life and, upon her death, the remainder was devised to her children in fee.

To Frank was devised the other half of the estate in fee; and in the event of his death occurring before that of the testatrix and he having no children, his half was given in trust to Carrie for life, and remainder in fee to her children. In case no children survived either Carrie or Frank, then the estate was devised in part to the relations of the testatrix, and in part to the relatives of her deceased husband.

Mrs. Bradford was greatly devoted to her children and grandchildren and manifested for them the greatest solicitude and affection; and the only thing disclosed by this record that occurred between the execution of the first will and the second to cause her to alter the former was the fact that her son Frank had become addicted to the use of intoxicating liquors, which caused her to apprehend he might squander the interest devised to him. She, therefore, concluded to change the terms of her will made in 1886 and place Frank's interest in trust for him during life, and give the remainder in fee to her grandchildren, in the same manner she had devised Carrie's interest.

The evidence showed that Frank was afflicted with catalepsy or epilepsy and had been ever since 1880, but the evidence shows the affliction did not disqualify him from the transaction of business.

The testatrix was a very small woman, weighing from eighty-five to ninety pounds, was almost deaf, and had been very weak and frail for seven or eight years prior to her death, and was subject to exhaustion or sinking spells, which increased in number and severity from year to year, during which times she was wholly incapacitated to transact business, but at all other times she was capable of transacting her business in an intelligent and business-like manner, and was an unusually bright and intelligent woman, far above the average, and was possessed of a strong will and generally had her own way regarding matters. At the time of the death of the testatrix her estate was worth not less than $300,000, and some of the witnesses valued it at $500,000. The annual income thereof was from $15,000 to $18,000.

These were substantially the conditions which existed at the time the will in question was executed, and with those matters in mind she set about to have this will drawn. In the first place she wished to have Alfred Bradford, a brother of her husband, and the father-in-law of defendant Howard Blossom, to act as executor of her will and as trustee for the beneficiaries under the will, but he declined to act on account of his health and age. Upon the advice of friends she approached the defendant, Blossom, and requested him to act in those capacities, which he agreed to do. The evidence also shows he was her confidential friend and business adviser, especially upon matters of more than ordinary importance to her.

The testatrix told Mr. Rutledge, her business agent and one of the persons who advised her to go to Mr. Blossom, that she intended to place Frank's half of

the estate, as well as Carrie's, in trust for their benefit during their lives, and to devise the remainder to her grandchildren.

The defendant, Blossom, testified that Mrs. Bradford came to him and requested him to act as executor of her will and trustee for the beneficiaries thereunder; and requested him to have the will drawn, disposing of her property according to her desires, which she stated to him. And in that connection he testified as follows:

"Q. Please tell the jury, beginning at the beginning, just what you had to do with respect to that, at whose instance you engaged yourself about it, and what you did? A. Mrs. Bradford was desirous of having a will drawn, which would enable her children to enjoy the income of her estate during her life time, and to give the property to her grandchildren after the death of their parents. Mrs. Bradford applied to my father-in-law to become the trustee, and on account of his health he told her that he would rather not and that he would probably not live as long as she did.

"Q. Go ahead. A. And she asked him then if I would take charge of the property as the trustee, and he thought she had better see about it. She spoke to me about a will and told me what she wanted to do.

"Q. Say what she told you. A. She wanted to give the children the income of the property during their lifetime, Carrie and Frank, and the remainder to her grandchildren. That is, the estate to her grandchildren at the death of their parents.

"Q. I call your attention to two sheets of paper that have been marked 'A. 1' and 'A. 2,' containing I think really one paper. And I will ask you who prepared the memoranda contained in those sheets of paper? A. They are in my handwriting, that is, the principal part." They are as follows:

207 Sup.—13

"EXHIBIT A. 1.
"Blossom Place.
"St. Louis —— — 188--

"The income—

"To Carrie and Frank during their lives, equal parts.

"If Frank marries and has children—and dies—one-half of his share to wife, while a widow.

"To children.

"If Frank marries, and has no children—and dies, one-half of his share.

"To wife, while a widow.

"To be added to principal and invested.

"If Frank's widow dies add the share to principal.

"If Frank does not marry, one-half of his share may be added to Carrie's allowance, at trustee's option.

"If Carrie dies, her income to her children as they may need, at trustee's discretion, and through her husband, or may direct payment of bill trustee's discretion.

"If Carrie's childen die, after Carrie and before their 21st year, their share to

"Frank if surviving, or his children, if any, or added to principal.

"As trustee may deem expedient at the time.
The principal.

"To the children of Frank and Carrie, per stirpes, at the age of twenty-one or after the parents demise.

"If Frank die, unmarried, his share to Carrie's children, if they survive to inherit as above—but if he leaves children, to them at the age of twenty-one or after his death.

"If Carrie die, after her children, her share to Frank or his children.

"And, if Frank or Carrie leave no lineal descend-

ants, heirs of their bodies, then the estate shall not be turned over to the grandchildren until they reach the age of twenty-one, respectively, or after the parents' death, and shall not be liable for debts made prior to actual possession.''

"EXHIBIT A. 2.
"Blossom Place.
"St. Louis,———188-

"The income shall

"Not be assignable for any purpose by C. Q. T., not liable for their debts either before or after testator's death.

"Be payable in such sums as trustee deems sufficient to keep them in comfort, and not wastefully, and any excess be divested and added to principal.
The trustee has power

"To sell any or all for purposes of reinvestment to regulate in a reasonable degree the expenditure of C. Q. T. and to prevent extravagance, speculation or wastefulness.

"To invest principal or accumulations in real estate or other approved securities.

"To deduct from income expenses and taxes for caring for estate.

"To advance, temporarily, a portion of income to either C. Q. T. if justified by his judgment.

"To relinquish the trust and transfer same to a trustee company to be selected by him."

"Q. Where did you prepare that? A. At my father's house, who was then alive, where I now live.

"Q. And at whose suggestion were you acting? A. On the suggestion and at the request of Mrs. Bradford.

"Q. Is that setting down the points of the will? A. She talked to me about what she wanted and I put down here what she had indicated to me.

"Q. What did you then proceed to do in respect to carrying her wishes into effect? A. I took this to Mr. Thompson, William B. Thompson.

"Q. Was he your own lawyer at that time, the man you went to with your own affairs? A. He had acted as counsel for me and for Alfred Bradford and I believe for Charles Bradford; yes, all three of us, and I took it to Mr. Thompson and said to him that Mrs. Bradford desired to have her will drawn; and we had some conversation about it previously. It was she who indicated to me the spendthrift trust of the Ulrici will, and in talking to Mrs. Bradford I had said to her that there was such a case as that, and it seemed to strike her as the thing she wanted; she wanted to protect her children against any contingency whereby they would not have sufficient income during their life.

"Q. Did Mr. Thompson indicate to you that he had drawn the original will or was familiar with it? A. Mr. Thompson indicated to me that he had either drawn the will or he had won a contest that there was over it, or something of that kind, because the man who was named in the spendthrift trust, Adolph Taylor, was a young fellow that I went to school with, and it was through that conversation respecting Taylor that the subject-matter came up.

"Q. And did you tell Mrs. Bradford about this? A. I spoke to Mrs. Bradford about the manner in which this will was drawn by Mr. Thompson, or defended by him, I don't remember which it was.

"Q. And that there had been a strong trust maintained there? A. So that a guardian couldn't take the property away from her children.

"Q. What did she say with respect to that, as to what she wanted? A. Mrs. Bradford seemed to be very desirous of having it so arranged that there could be no doubt about her children having the income and that her children should leave it for her grandchildren.

That is to say, that the remainder, what you would call the remainder, she didn't call it that, but the balance of the estate should go to her grandchildren after their parents were dead. We also spoke about Frank being married, and if he should die, about his widow and what interest she should have while she remained his widow and so on.''

And on cross-examination he testified as follows:

''Q. Mr. Blossom, you say that Mrs. Bradford stated to you in the conversation that she wanted the income to go to her children, Carrie and Frank, the corpus or the principal of the estate to her grandchildren? A. That was what she intimated, she would not have said it in exactly that way, but that was what she wanted.

''Q. Tell us exactly what she said? A. I could not do it at this time, I can tell you the substance of what she said, that she wanted the income to go to her children and the estate to go to her grandchildren.

''Q. You stated a little while ago that she wanted the remainder to go to her grandchildren. A. Yes, sir.

''Q. That is what she told you in the conversation, is that all she told you? A. Oh, no, she told me more about it, the substance of what she told me is contained in this paper.

''Q. Mr. Blossom, do you mean to say that this will expresses the idea that Mrs. Bradford communicated to you and desired you to do in these premises. A. I believe so, yes, sir.

''Q. You belive so? A. Yes, sir.

''Q. Didn't she say to you that she wanted the income of this property to go to her children and the corpus of the estate to her grandchildren? A. Well, don't it?''

He further testified that he gave the memoranda to Mr. Thompson and that Mr. Thompson drew a rough

draft of the will from the memoranda, which reads as follows:

## "EXHIBIT B.

[Note: The italicised parts represent the pencil interlineations and marginal notations in pencil, in the original.]

"I, *Emma* Virginia *Burns* Bradford, widow *of the late Wm. E. Bradford* of the city of St. Louis, State of Missouri, being of sound mind and memory and mindful of the uncertainty of life, do by these presents make, publish and declare the following instrument to be my last will and testament, hereby expressly revoking all other wills made and published by me."

### "I.

"I declare that I have now living two children: My son, Frank E. Bradford, and my daughter, Carrie Bradford Ryan, wife of Alfred Ryan; that I have no debts or obligations, of any character, to be allowed against my estate, except such as may accrue for my last sickness and funeral, and except such as may be secured on real estate purchased by me, for the deferred payments of the purchase price, for which I have hereinafter made special provision. And as to all other debts and obligations, I direct my executor hereinafter named to contest the validity of any claim against my estate which in his opinion is of long standing and supported by doubtful or uncertain evidence.

"It is my will that all of my estate, real personal and mixed, wherever situated, and to which I am entitled either at law or in equity, vested in me in fee simple, or otherwise, by virtue of any gift, grant, devise, inheritance, or by virtue of any conveyance made to any trustee or trustees for my use and benefit, or under any power mentioned in such conveyance, which authorizes me to appoint, dispose, or devise by last will and testament, or any other conveyance in the na-

ture of a last will and testament, any of such property, real, personal or mixed, I do hereby will, devise and bequeath to my friend Howard A. Blossom.

"To have and hold the same unto him, the said Howard A. Blossom, and to his heirs and assigns forever.

"In trust, however, for the following purposes, to-wit: To collect and receive all the rents, issues and profits thereof, and to pay all the taxes, insurance and repairs, and all other expenses, which in the discretion of the said trustee may be deemed proper and expedient to be incurred in holding, managing, controlling, and disposing of said property; and to pay out of said income (or principal, if necessary), so held by the said trustee any sum or sums of money that may be recovered by any action at law or suit in equity against said trustee, by any person or persons whomsoever, for any damages, or injuries sustained by any person or persons by reason of any act done, or the omission of any act, by the said trustee, by which any cause of action for any injury or damage shall result, and for which any person or persons may be entitled to recover against said trustee for such injuries or damages. *Wants to provide that Frank and Carrie may select out of her house, stationery, pictures, laces, and jewels, equal in value—if they can agree, and the trustee to decide if they disagree. (Codicil or clause as you elect.)* (Margin.) and from the net income thereof, after the payment of all such sums required herein to be paid by said trustee, to divide the said income into two equal parts; to suffer and permit my son, Frank, to use and enjoy so much of the one part of the said net income for and during his natural life as my said trustee may deem proper to pay him, such payment to be made to him in such sum or sums and at such time or times as said trustee may determine, paying the same into his own

hands and taking his receipt therefor. And from the other part of said income to suffer and permit my daughter, Carrie, to use and enjoy so much of said part of said net income, for and during her natural life, as my trustee may deem proper to pay her, such payment or payments to be made to her in such sum or sums, and at such time or times, as said trustee may determine, paying the same into her own hands and taking her receipt therefor. *Neither nor their heirs to have any rights of alienation, assignment or pledge and instrument purporting, etc., to be null and void as against this trust.*

"(a) III. And in further trust, after the death of said son Frank, in the event of his marriage and his wife should survive him, to suffer and permit his widow to use and enjoy so much of one-fourth (i. e., ½ of his share), of said net income, for and during the period of her natural life, if she shall remain the widow of my said son Frank, as my trustee may deem proper to pay her, in such sum and at such times said trustee may determine, paying the same into her own hands and taking her receipt therefor. *If death or marriage of mother, all Frank's share to his child or children.* (Margin). And in further trust, that in case my said son Frank shall marry and any child or children shall be born of his body, who shall survive him, to suffer and permit such child or children to use and enjoy so much of one-fourth of said net income (i. e., ½ of his share) for and during the period of the minority of such child or children, as my trustee may deem proper to pay to the lawful guardian of such child or children, in such sums and at such times as said trustee may determine; said payments to be made into the hands of the said guardian or legal custodian of such child or children, or directly to such child or children, if my said trustee may deem such payment proper and expedient, and taking the receipt of such child or children therefor.

*If death or marriage of mother, all Frank's share to his child or children.* (Margin.) And in further trust, that in case my said son Frank shall die without issue born of his body, leaving a widow, then one-fourth of the net income is to be added to the principal *and* held by the said trustee as herein provided for the disposal of the said principal. *If death or marriage of mother, all Frank's share to his child or children.* (Margin.) And in further trust, that in the case of the death of my said son Frank, unmarried, and without issue born of his body, and prior to the death of my daughter Carrie, then I direct my trustee to suffer and permit my daughter Carrie to use and enjoy *as much* of the said net income for and during her natural life, as my said trustee may deem proper to pay her, in such sum and at such times as said trustee may determine, paying the same into her own hands and taking her receipt therefor.

"IV. And in further trust, in case of the death of my said daughter Carrie, leaving a child or children born of her body, to suffer and permit such child or children to use and enjoy so much of (one-half of) said net income (*as she would be entitled to, if living*) for and during their minority, as my trustee may deem proper to pay them, or the guardian or custodian of such children, in such sums and at such times as said trustee may determine; and *said payments to be made into the* hands *of* said guardian or *legal* custodian, or directly to said child or children, *if my said trustee may deem such payment proper and expedient,* and taking the receipt therefor, *of such child or children, or shall die leaving a child or children who shall not attain their majority or leave descendants.* And in further trust, that if my said daughter Carrie shall die leaving no children or their descendants, (g) or in case of her death any of her children shall not attain the age of twenty-one years and shall die leaving no descendants,

and (h) my son Frank shall survive the said *daughter* Carrie and said children and their descendants, or my said son Frank shall marry and have any child or children born of his body surviving him and after the death of my said daughter Carrie and her descendants, and any of her children shall not attain the age of twenty-one years and shall die leaving no descendants, then my said trustee shall suffer and permit my son Frank (or his child or children) to use and enjoy so much of the entire income of said estate, for and during his natural life, as my trustee may deem proper to pay him, in such sums and at such times as said trustee may determine, and paying the same into his own hands and taking his receipt therefor. And in further trust, that in case my said daughter Carrie should die surviving my son Frank (*he leaving no child or children*) leaving children born of her body, to suffer and permit such child or children to use and enjoy so much of the entire net income of said estate as my trustee may deem proper to pay them during their minority, or their guardians or custodians, in such sums and at such times as my said trustee may determine, paying the same into their hands, or into the hands of their guardians or custodians as he may deem proper, and taking either the receipt of such guardian or custodian or of the said children, as he may determine as proper and expedient.

"V. And in further trust, that if my said daughter Carrie shall die leaving a child or children who shall not attain their majority, *or leave descendants* and in case my said son Frank shall die, unmarried, *or if married,* without children born of his body, *or shall die leaving a child or children who shall not attain their majority or leave descendants* (Margin) then I do will, devise and bequeath to Alfred Bradford and Charles H. Bradford, if they shall then be living, for and during their natural lives (*This should be same as on page 5*). (Margin), and after the death of Alfred Bradford and Charles H. Bradford to the heirs of Al-

fred Bradford, a certain lot or parcel of land situate in the city of St. Louis, State of Missouri, being a lot of ground having a front of 40 feet on the north line of Washington avenue by a depth of 125 feet; said lot commencing at a point on the north line of Washington avenue 95 feet east of the east line of Sixth street, running thence north and parallel with Sixth street 125 feet, thence east and parallel with Washington avenue 40 feet, thence south and parallel with Sixth street 125 feet, thence west along the north line of Washington avenue 40 feet to the point of beginning.

"To have and to hold the above described premises to the heirs of the said Alfred Bradford, and their assigns forever.

"And in further trust, that *if my* said daughter Carrie *shall die leaving a child or children who shall not attain their majority or* leave descendants her, and also in case of the death of my son Frank, *unmarried, or if married,* leaving *without* children *born of his body, or shall die leaving a child or children who shall not attain their majority or leave* descendants (Margin), or, then in trust to convey all the rest, residue and remainder of my estate, real, personal and mixed, including the principal and income thereof, to the *legal* heirs of my *two* sisters.   (1)   *Mrs. Caroline A. Wood* (2)   *Mrs. Margaret Mygatt, both now deceased.*

"To have and to hold the same unto them, their heirs and assigns forever.

"VI.   And in further trust, that if my said daughter Carrie shall die, leaving a child or children and *when* youngest of such child or children shall attain the age of twenty-one years after the death of their said mother, and in case of the death of my said son Frank, leaving a child or children born of his body, and *when the* youngest of whom shall attain the age of twenty-one years *after the death of the father* then I direct my said trustee to divide the principal of said estate into two moieties; one of which I direct he shall

Bradford v. Blossom.

convey in fee simple to the child or children, *or the descendants thereof* of my daughter Carrie, discharged of said trust, and the other moiety I direct said trustee to convey in fee simple to the *child or children or the descendants thereof* of my son Frank, discharged of said trust.

## "VII.

"It is my will, and the said trustee is further authorized and empowered that at any time during the life of my son Frank and my daughter Carrie or at any time after the death of either of them and during the existence of the trusts hereinbefore mentioned and set forth, to sell and convey in fee simple, or lease for a term of years or mortgage, or convey by deed of trust, or otherwise encumber any or all of the real estate held and owned by me, and to invest the proceeds thereof in real estate securities, or in municipal, State or county bonds, for the same uses and trusts, and to pay over the income therefrom in the same manner as the rents and income of the real estate and other property is to be paid under the provisions hereof.

"And the said trustee is hereby authorized to *lease,* empowered to pledge, hypothecate, mortgage or otherwise encumber any of the real estate herein devised, for the purpose of paying off any mortgage or other encumbrances existing upon any of the real estate herein devised, or to sell any of the real estate for the purpose of paying off any encumbrances.

"And the said trustee is further authorized and sell and convey in fee simple, or otherwise dispose of any part or portion of any of the property so held by him in trust under the provisions here, as he may deem expedient, it being left entirely to his discretion when such *leases,* sales, hypothecations or dispositions of said property shall be made.

## "VIII.

"*I think the ex-alienation d on page 2 might go here.*

"In conclusion I do hereby nominate and appoint my friend Howard A. Blossom executor of my will and I do especially direct that he be authorized and empowered to qualify and perform all the duties required by the laws of the State of Missouri, as such executor, without giving bond to any person or to the state for such duties in said office. And it is my further will that said Howard A. Blossom, as trustee under the trusts herein created, shall perform the duties and obligations of said trusts without being required to give bond to the State of Missouri, or to any beneficiary or to any person, for the faithful discharge of his duties as such trustee.

"It is my further will, and I direct and request my executor to finally settle my estate and make distribution thereof as soon as the laws of the state will permit.

### "RELATION TO SUCCESSOR.

"*I further authorize said Blossom, in the event of his absence from the State or county to appoint a substitute or successor as he may elect, but if said Blossom should die without such appointment, or if a successor be appointed and he should die, then I appoint the Mississippi Valley Trust Company as my trustee with all the powers herein conferred, etc.*"

"In witness whereof, I have hereunto set my hand and seal this day of June, A. D., 1893.

— — — — — — — — — — (Seal.)

"Witnesses:"

He also testified that he took this rough draft of the will and corrected and made the interlineations which appear therein, which are indicated by the italics.

The rough draft in the corrected form was delivered to Mr. Thompson, and from that he drew the will of 1893, the one in controversy.

Mr. Blossom never showed the memoranda on A. 1 and A. 2, nor the rough draft of the will in its original or corrected form, to Mrs. Bradford.

"Q. Mr. Blossom, you have stated that you had this (the will) drawn in accordance with what Mrs. Bradford stated to you and read it after it was finally drafted by Mr. Thompson? A. I think so.

"Q. And it was satisfactory to you? A. Yes, it seemed to carry out her desires.

"Q. What is that? A. It seemed to carry out her desire.

"Q. Her desire was that the income of this property should go to Carrie and Frank during their lives and the remainder to their children, that was her desire, was it? A. Undoubtedly.

"Q. And after their death the trust should cease, shouldn't it? A. After the death of the children.

"Q. After the death of Carrie and Frank? A. After the children became of age.

"Q. Twenty-one years of age? A. It don't say so, I don't think I said so, I said became of age.

"Q. Well, became of age then? A. Yes, sir, became of age.

"Q. Then the trust was to cease? A. I understood it that way, yes.

"Q. The property was to be turned over to the children? A. The children.

"Q. I mean the grandchildren? A. I so understood it, yes, the grandchildren."

He further testified that there was nothing in the will but what he thought she wanted, and he got that thought from what she said. Mr. Thompson "either sent the will to me and I mailed it to Mrs. Bradford, or he mailed it to Mrs. Bradford direct, at her house, I could not say at this late date, I did not keep any memorandum of it," and "she must have had it a week or ten days before she signed it."

"Q. Do you remember the circumstances of the final execution of this will? A. I do not recollect them very distinctly, no, sir. I remember that I met Mrs.

Bradford and took her up to Mr. Thompson's office and introduced her to Mr. Thompson and left her there.

"Q. Yes, and did you call for her subsequently? A. I would not like to say that I did or that I did not, but my impression is I did not, my impression is that I did not call on her at all after I left her there.

"Q. After the will was executed who had charge of it, or did you have charge of it after the paper was executed? A. I never saw it again until it was probated—until it was taken out of the safe deposit box."

Mr. Blossom never discussed or talked about the will to Mrs. Bradford after it was drawn by Mr. Thompson.

Mr. Thompson testified on behalf of the proponents, substantially, as follows:

I am an attorney-at-law and practice in St. Louis. I cannot say I knew Mrs. Emma Bradford. She came to my office to sign a will. I never saw her before in my life.

The will in question was shown to him, and he further testified. I recognize this as a paper I have seen before. It was prepared in my office. I saw Mrs. Bradford sign the paper. Sophie Loessler and I signed it as witnesses, at the request of Mrs. Bradford. My recollection is she declared it to be her last will and testament. She appeared to be mentally sound at the time.

On cross-examination he testified, substantially, as follows:

I wrote the will at the request of Mr. Howard Blossom, the defendant. He brought Mrs. Bradford to the office and introduced her to me, and I think he then retired from the office, and left her there with me and Miss Loessler.

Mrs. Bradford was a very small, delicate looking woman, small in stature and small and very light in weight—would weigh less than one hundred pounds.

I think I had three consultations with Mr. Blossom regarding the will. The first was before anything was done toward drawing it; the second was when he showed me certain memoranda; and the third was when I showed him the rough draft of the will I had prepared. I have the rough draft (which was produced by witness, and is the same draft of the will which has heretofore been set out, and marked "Exhibit B."). I got the information upon which the rough draft is based from Mr. Blossom.

Witness here objected to answering any more questions, because such answers would disclose privileged communications which took place between him and Mrs. Bradford, his client. Counsel for proponents stated that in his judgment the matters under investigation were not privileged, and, that, even if they were, he waived all objections to the questions, and requested the witness to answer them.

"The Court: Yes, you may answer the questions. A. My recollection is he told me that Mrs. Bradford had made a will that was not satisfactory to him and that he wanted another will drawn.

"Q. Then what took place after that, Mr. Thompson? A. I think we discussed several features. For instance, I think there was one we discussed, something in regard to the powers of a trustee. I had represented—I now recollect one part of the conversation. I had represented Mr. Adolphus Boeckeller, who was the executor of the will of Rudolph W. Ulrici, a will that I had drawn some years before, a very elaborate will, some sixty-three pages, and covering a great many trusts, and Mr. Boeckeller had been sued for damages as a trustee in reference to some of the property; and I called Mr. Blossom's attention to that fact, and we discussed that and the principles of that case were embodied in this will.

"Q. Did he state to you during that first conversa-

tion who he desired this property to go to in the will? A. He desired—he stated to me that he desired to have spendthrifts' trusts created under the will; something similar to the Ulrici will.

"Q. I am speaking now of the first conversation. Did he say anything about his desire that any of this property should be willed to his wife? A. Yes, in case of certain failure of issue and death of parties, that his wife should get the benefit of it.

"Q. Was this gone into during the first conversation? A. Well, I think generally; there was a general talk over the will and a general statement to me in regard to the parties that were interested. I think he stated to me about her having two children, and he also made the statement in regard to how this will should be drawn in regard to their interests so that there were spendthrifts' trusts. I did not know the children, except Frank. I had met Frank Bradford at one time previously.

"Q. After this conference, what did Mr. Blossom do with reference to giving you any data or memorandum or memoranda upon which this will was prepared? A. Mr. Blossom gave me memoranda in writing. In fact, I retained those memoranda. They were on two separate slips of paper. I think that memorandum was given to me before I made the rough draft of the will. That is my recollection.

"Q. Have you that memorandum? A. I have.

"Q. And you have the rough draft of the will, have you? A. I have. I have two sheets of paper in my hand; one of them is marked 'A—1' and the other is marked 'A—2;' and the one marked A—1 is all in the handwriting of Mr. Blossom except the words 'Carrie Bradford Ryan' and 'Alfred Ryan' and 'Frank E. Bradford' and 'Emily Virginia Bradford, widow.' Except, probably, there seems to be in pencil there the

fraction '½' and a dash in pencil, and that '½' looks very much like my figures. The one marked 'A—2' is all in the handwriting of Mr. Blossom except some memorandum on the back of it. The first memorandum on the back of it is in the handwriting of Mr. Blossom, and the second memorandum, '40 feet on the north line of Washington Avenue commencing 95 feet east of 6th St. and thence 40x125 feet in depth,' is in my handwriting. That is on 'Exhibit A—2.'

"Q. Did you have any other information or any other direction or any other data upon which the first draft of the will was prepared, except the two sheets marked 'A—1' and 'A—2'? A. If I had, I have not any record of them at the present time. I may have made some memoranda at the first interview, the first consultation, but I have no memorandum of it.

"Q. What did Mr. Blossom say about this property, or part of this property, going to his wife? A. Mr. Blossom stated to me that in the event that Frank Bradford, who was a bachelor, and that Mrs. Ryan— I did not understand at that time whether Mrs. Ryan had children or not. If I did, if he stated it I have no recollection at the present time of her having any children—but he stated to me distinctly that in case of their deaths that with the exception of some relatives of Mrs. Bradford, that his wife—that he wished the will drawn so that his wife would take that portion of the estate.

"Q. Now, after this memorandum— A. And I—

"Q. What were you going to say? A. And I think I drew it in that way—just as he stated it to me.

"Q. After he brought you the memorandum in the two papers, 'A—1' and 'A—2,' which you have referred to, then you prepared the rough draft of the will, did you? A. Yes, I prepared this paper; dictated it to my stenographer, Miss Loessler, and she drew it off afterwards, translating it from the stenography to

typewriting and wrote it off, and this is the paper, with the exception of the interlineations and changes in it, which are in Mr. Blossom's handwriting with the exception of perhaps all the pencil memorandum on, we will say, page 1, is in Mr. Blossom's handwriting, all of the pencil memorandum on page 2 is in his handwriting, all of the pencil memorandum on page 3 is in his handwriting, all of the pencil memorandum on page 4 is in his handwriting, all of the pencil memorandum on page 5 is in his handwriting. On page 6 those pencil memoranda in writing are in his handwriting, but there are some written words on page 6 in my handwriting, interlineations. The words are, 'or lease for a term of years,' on the 5th line of page 6, and in the second paragraph of page 6 there is also the word 'leases' in my handwriting; and, also, in that same paragraph, at the end of the paragraph the word 'leases' is also in my handwriting. On page 7 the pencil memoranda is in Mr. Blossom's handwriting, which refers to the power of his appointing a trustee in case of his death.

"Q. What became of that paper, after you had prepared it? A. This paper, after I had prepared it, after I had prepared from those first memoranda and any other memorandum that I made, and from the interview of Mr. Blossom, was delivered to Mr. Blossom.

"Q. Did he take it out of the office? A. He took it out of the office, and before he took it out of the office there were no memoranda on it, no pencil memoranda. It was simply in the typewritten form, as it has been dictated; and then it was returned with these interlineations and statements—and pencil memoranda, in the handwriting of Mr. Blossom.

"Q. And then, after that, you prepared the will? A. After that, I prepared the instrument there that is now witnessed, that was witnessed by myself and Miss Loessler.

"Q. I believe you stated that you had never seen

Mrs. Bradford prior to that time? A. I never had.

"Q. Never had acted for her as her attorney in any matter? A. I never had acted for her in any matter.

"Q. How long had you acted for Mr. Blossom? A. I did not know exactly. I have a memorandum in my hand which refreshes my memory in regard to acting for Mr. Blossom. I had quite an important suit for him in equity against a man named Cousins for the recovery of some property on Grand avenue—that I had from Mr. Blossom, and I acted for Mr. Blossom from that time down to 1898.

"Q. You were his counsel in matters at the time that he employed you to write this will? A. I don't know that I was his sole counsel; I only know from the memorandum that I have here of certain matters that I acted for him as his counsel. I never was counsel for Mrs. Bradford.

"Q. When he came to your office during one of these conferences, did he ever say anything about Mrs. Ryan, Alfred Ryan, her husband, or Frank Bradford? A. In one of these conferences he spoke very disparagingly of both of them to me.

"Q. What do you mean by disparagingly? A. Well, language indicating that they were of no account; that they were absolutely without merit or, or—people of no consideration. I don't remember the exact words, but they were disparaging remarks. That is all I could say about it; I do not remember the exact words.

"Q. At the time he came to your office and stated that Mrs. Bradford had made a will prior to that time which was not satisfactory to him, did he bring the will with him that had been made? A. I don't remember of ever seeing the will.

"Q. You have no recollection of his having presented the will to you at the time, which was unsatisfactory? A. I have not. I don't think I ever saw it; I think if I had seen it I should have remembered it, too.

"Q. How long was Mrs. Bradford at your office when she came to sign that will, Mr. Thompson? A. Well, I couldn't say; it was a very short time. So far as my recollection goes, it was simply an introduction. The will was brought there. It was not in our office at the time; it was brought there. The will had been delivered in the condition it is now with the exception of the signature, to Mr. Blossom, after it was completed, and it was brought there by Mrs. Bradford, and I think Mr. Blossom was with her. Now, she did not stay there but a few minutes.

"Q. Did she read the will while she was there? A. No, she did not read the will.

"Q. Did you read the will to her? A. I did not.

"Q. Did she discuss the provisions of the will to you? A. Never; not a word of it, that I remember of.

"Q. In the conversation that you had with Mr. Blossom was there anything said in the conversation, I mean outside of these memoranda, about tying this property up for any length of time? A. Yes, sir.

"Q. What was said about that? A. He wanted it tied up, and he wanted to have the control of it as long as the law would permit, and if you will look at those memorandums there, you will find that I had to correct those memorandums in order to avoid the rule against perpetuities.

"Q. And there was a conversation between you and Mr. Blossom in which he expressed the desire to have this property tied up just as long as the will would permit it? A. Yes, sir; and furthermore, he drew this clause—that was not in my draft of the will—this

clause here marked 9, in regard to the succession of the trustee.

"Q. Do you refer to the clause where he can appoint a successor either in writing or by a last will and testament? A. Yes, sir.

"Q. Mr. Thompson, did you explain the provisions of this will to Mr. Blossom? A. I did, very thoroughly, and discussed every feature of it with him.

"Q. Did you discuss the effect of each provision of the will? A. I undoubtedly did, because of the memorandum, and because of the peculiar and—peculiar and unusual provisions of it.

"Q. And this will was drawn, you say, in accordance with the direction of Mr. Blossom in these conferences and including this memorandum which he gave away? A. Undoubtedly so. I drew the will exactly as Mr. Blossom wanted it.

"Re-direct examination, by Mr. Lehmann.

"Q. Mr. Thompson, you sent a bill for your services to Mrs. Bradford? A. I did.

"Q. And she paid it? A. I don't remember now —it was paid. I sent the bill to her, and I looked up the memorandum the other day and found that the bill was paid along in September.

"Q. And you were doing this work for her? A. I charged the bill to Mrs. Bradford, undoubtedly, I understood Mr. Blossom was acting as her agent.

"Q. And you understood from him that the statements he made about how he wanted the bill drawn reflected her desires with respect to the will? A. I can only tell you what he stated to me; he told me how to draw the will.

"Q. Yes, you were drawing it for Mrs. Bradford, were you not? A. I was drawing the will for her to sign, it was her will.

"Q. As her will? A. I was drawing it for her to

sign; I never had any conference with Mrs. Bradford of any kind, you understand that.

"Q.  But you understood that what you were putting in there—you understood from Mr. Blossom—that that is what she wanted in there?  A.  I can only tell you what Mr. Blossom told me at the time; you can draw your own conclusion.

"Q.  Mr. Thompson, did you understand that Mrs. Bradford wanted those things in there?  Did not you understand that from Mr. Blossom?  A.  I would not like to say that.

"Q.  Do you mean to say that you would draw up a will for an old lady and send her a bill, when you did not understand it to be the will she wanted?  A.  No, sir; I do not say any such thing.  I never saw this lady, in any way, shape or form.

"Q.  I did not ask you that?  A.  Mr. Blossom came there with his own memorandum for me to make the will in accordance with this memorandum, and they were made by him and not by her.

"Q.  I ask you whether you did not understand from him that what he told you represented the desire and the will of Mrs. Bradford?  A.  I cannot say that.

"Q.  Did you not believe when you were drawing up the will that it was such an one as Mrs. Bradford wanted?  A.  I cannot say that, Mr. Lehmann, I would not say that under any circumstances unless she were present and approved it.

"Q.  And you mean to say that she came here and signed that will before you?  A.  Undoubtedly.

"Q.  And executed it?  A.  Undoubtedly did so.

"Q.  As her last will and testament?  A.  Yes, sir.

"Q.  And you probated it and so testified at the probate in common form?  A.  I did without any doubt.

"Q.  That she had executed that will as her last will and testament?  A.  I did, and I am sure when

she signed the will— I am almost certain I asked her if that was her will.

"Q. And did you not believe it to be her will? A. Well, now, if you ask me my belief I will say no.

"Q. You did not? A. No.

"Q. And yet you signed that probate? A. Yes.

"Q. And sent her a bill for it? A. Certainly, because I didn't think she understood those clauses in that will, not any woman would understand it.

"Q. You quarreled with Mr. Blossom because you were not employed in this case? A. No, I will tell you why I quarreled with him, if you want to know.

"Q. You have quarreled with him? A. Oh, no. I never have quarreled with him on that account.

"Q. You and Mr. Blossom are not on good terms, are you? A. No, I will tell you why.

"Q. That is all. A. I am entitled to tell why.

"Re-Cross Examination, by Mr. Williams.

"Q. We will ask why you and Mr. Blossom are not on good terms? A. Mr. Blossom had a claim in the probate court against his wife's deceased cousin, Doctor Bradford —

"Mr. Lehmann: I object to that."

Which was sustained, and witness was not permitted to state the cause of the ill-feeling that existed between him and defendant Blossom.

We have omitted from this statement much of the evidence contained in the record, because not material to the questions presented by this appeal. A more detailed statement of the facts of the case may be found by consulting the opinion delivered when the case was here before.

The court, over the objections and exceptions of contestants, at the request of the proponents, gave twelve instructions to the jury. Under the view we take of the case it will not be necessary to copy them in this opinion.

The plaintiffs and minor defendants, by their guardian *ad litem,* requested the court to give twelve instructions, all of which were refused, and they duly excepted. The first of which is as follows:

"1. The jury are instructed that the issue to be tried in this case is, is the paper writing, dated the 21st day of July, 1893, propounded as the last will and testament of Mrs. Emma V. Bradford, deceased, and witnessed by W. B. Thompson and Sophie C. Loessler, in truth and in fact the last will and testament of said Emma V. Bradford or not; and upon this issue the court instructs the jury that under the pleadings and the law and the evidence the jury must find that the paper propounded as the last will and testament of Emma V. Bradford, which bears date July 21, 1893, and attested by W. B. Thompson and Sophie C. Loessler, is in truth and in fact not the last will and testament of the said Emma V. Bradford."

The court then, at the request of contestants, gave instructions numbered from one to seven, inclusive, but as no objections are urged against any of them, it will be unnecessary to set them out in this statement.

The cause was then submitted to the jury on the evidence, and under the instructions of the court, and on June 11, 1906, the jury found the issues for the proponents, sustaining the validity of the will. Judgment was duly entered upon the verdict, and within four days thereafter the plaintiffs and minor defendants filed their motion for a new trial, which was thereafter, by the court, overruled, and to which action of the court in overruling said motion, they at the time excepted, and have duly appealed from said judgment to this court, and have assigned the following errors, among others, to-wit:

1. The court erred in refusing instruction numbered 1, which told the jury that under the pleadings, the law and the evidence the instrument propounded

as the last will and testament of Mrs. Bradford was not in truth and in fact the last will and testament of the said Mrs. Bradford.

2. The court erred in giving instruction numbered 16, which assumes that the will was drawn by mistake, and tells the jury that if Mr. Blossom believed that such a will as he had requested his attorney to draw was drawn, that this was no evidence of fraud or undue influence on his part.

3. The court erred in giving instruction numbered 13, which erroneously tells the jury that undue influence is such influence as caused the testatrix to sign a will that she did not want or did not approve, which instruction makes it necessary for the jury to believe that the testatrix was under force or compulsion when she signed the will before the charge of undue influence could be established.

4. The court erred in giving instruction numbered 15. This instruction not only carried the jury away from the issue of fraud and undue influence, but led them to believe that the court was justifying the will.

5. The court erred in admitting over contestants' objections evidence as to the compensation that contestants' counsel were to receive for their services in prosecuting the will contest. See testimony of Miss Julia Schofield and Robert Rutledge.

6. The court erred in admitting testimony from the witnesses Julia Schofield and Robert Rutledge that Frank Bradford had expressed impatience on account of the delays in getting the case to trial, which was used as evidence of a desire to abandon the prosecution of the suit.

7. The improper conduct of defendant's counsel in his closing argument to the jury referring to plaintiffs' attorneys as having and prosecuting a "client-less cause," and in improperly intimating and arguing

that the contest was being waged by the attorneys
without the consent of their clients for the large fees
that the said attorneys were to receive, unduly pre-
judiced the jury against plaintiffs' case and diverted
their minds from the real issue on trial.

8. The court erred in refusing instruction num-
bered 2, which told the jury that there was no evi-
dence of any disposition on the part of the contestants
to discontinue or abandon the prosecution of this suit.

9. The court erred in refusing instruction num-
bered 9, which told the jury that if there was a rela-
tion of trust and confidence existing between the testa-
trix and Howard Blossom at the time of the execution
of the will, and that Blossom received any interest
direct or indirect in the property devised and be-
queathed, then there was a presumption of undue in-
fluence on his part, and unless such presumption has
been overcome by countervailing evidence there should
be a finding against the will.

10. The court erred in refusing instruction num-
bered 7, which told the jury that if the will was ex-
ecuted by reason of the fraud or undue influence of
Howard Blossom, the testatrix was not presumed to
have read the same or to have known all its contents
at the time she signed it.

## OPINION.

I. The first assignment of error presents the ac-
tion of the court in refusing to give instruction number
one, asked by plaintiffs, which, in effect, told the jury
that the written instrument, dated July 21, 1893, and
propounded as the last will and testament of Emma
V. Bradford, was not, in fact, her last will and testa-
ment.

The plaintiffs contend that the uncontradicted evi-
dence in the case shows that the testatrix directed the
defendant, Blossom, to prepare her will for her, by

which she desired to devise to him all of her estate; one-half of which he was to hold in trust for the use and benefit of her son, Frank, for life—that is, the trustee was to pay all of the net yearly rents and income of said property to him for life, and, after his death, if he left children, to his children in fee; and he was to hold the other half in trust for the use of her daughter, Carrie, for life—that is, the trustee was to collect and pay the net income thereof to her during her life, and if she left children surviving her, then to such children in fee; but in case either of them died without children surviving, then his or her moiety was devised to the other upon the same terms by which the other half had been willed to him or her. And in case both died without children surviving, then one-half of the estate was to go to her relatives and the other half to the relatives of her deceased husband.

The evidence upon that subject is, substantially, as follows:

Robert Rutledge, testatrix's business agent and one of the persons who advised her to make defendant Blossom the executor of her will and trustee for the beneficiaries thereunder, testified that she consulted with him regarding her will and the disposition she wished to make of her property; that it was her intention and purpose to place Frank's half, as well as Carrie's, in trust for their benefit during their lives, with remainder to her grandchildren; that he advised her to go immediately and have it done; and that within a few days she told him that she had attended to the matter.

Defendant Blossom, upon the same subject, testified as follows:

"Mrs. Bradford was desirous of having a will drawn which would enable her children to enjoy the income of her estate during her (their) lifetime, and to give the property to her grandchildren after the death

of their parents.  .  .  .  She spoke to me about a will and told me what she wanted to do.  She wanted to give the children the income of the property during their lifetime, Carrie and Frank, and the remainder to her grandchildren.  That is, the estate to her grandchildren at the death of their parents.''

And on cross-examination he further testified:

''Q.  Mr. Blossom, you say that Mrs. Bradford stated to you in the conversation that she wanted the income to go to her children, Carrie and Frank, the corpus or the principal of the estate to her grandchildren?  A.  That was what she intimated.  She would not have said it in exactly that way, but that was what she wanted.

''Q.  Tell us exactly what she said?  A.  I could not do it at this time.  I can tell you the substance of what she said, that she wanted the income to go to her children and the estate to her grandchildren.

''Q.  You stated a little while ago that she wanted the remainder to go to her grandchildren.  A.  Yes, sir.

''Q.  That is what she told you in the conversation, is that all she told you?  A.  Oh, no.  She told me more about it—the substance of what she told me is contained in this paper.

''Q.  Mr. Blossom, do you mean to say that this will expresses the idea that Mrs. Bradford communicated to you and desired you to do in these premises.  A.  I believe so; yes, sir.

''Q.  You believe so?  A.  Yes, sir.

''Q.  Didn't she say to you that she wanted the income of this property to go to her children and the corpus of the estate to go to her grandchildren.  A. Well, don't it?''

We have quoted or substantially set forth all the evidence which tends to show the kind of a will the testatrix desired to make, and the disposition she

wished to make of her property thereby.   With that knowledge, and at the request of the testatrix, the defendant, Blossom, first consulted, generally, with his attorney, W. B. Thompson, regarding the kind of a will he wished drawn for her and stated to him that Mrs. Bradford had made a will but that it was not satisfactory to him.   Shortly afterwards he returned to the office of Mr. Thompson with the memoranda contained in ''Exhibits A-1 and A-2,'' which were to constitute the basis of her will.   From those memoranda the attorney drew the rough draft of the will, which is ''Exhibit B,'' set out in the accompanying statement. After having the rough draft fully and carefully explained to him, by Mr. Thompson, Mr. Blossom took it home with him, and, after making the interlineations, corrections, and additions in and to it, as mentioned in the statement of the case, the attorney, at the request of Mr. Blossom, drew the will of 1893, which is the will in question.

It must be borne in mind that Mr. Blossom never showed the memoranda which he furnished the attorney nor the rough draft of the will, drawn by the attorney, to the testatrix, nor did he, or the attorney, or anyone else ever discuss or explain to her the provisions or the meaning of the will after it was drawn, but it was sent to her by mail, and, after keeping it a week or ten days, she executes it in the presence of the witnesses, without reading or having it read to her.   Nor is there any evidence in this record which remotely tends to show that she ever read the will before she executed it, except the mere fact that she had it in her possession for a week or ten days after it was drawn and before she signed it.

Upon this state of the record, the plaintiffs contend that the will as drawn is not the will the testatrix directed the defendant Blossom to have drawn for her, and it does not make the disposition of her property

in the manner she understood and thought she was making it at the time she executed the will.

There can be no question but what the testatrix, at the time she signed the will, understood and believed that she was giving the income of her estate to her children for life, and if they left children surviving, then to such children in fee; but that if they died without such children, then one moiety was to go to her relatives and the other to the relatives of her deceased husband. The question now presented for determination is, does the will in controversy substantially conform to her said understanding of the will? Clearly we think not.

In the first place, all the evidence shows that the testatrix was very devoted to her children and grandchildren, and manifested great love and affection for them, and that she understood her children were to have the net yearly income of the property during their lives, while the will as drawn only gives to them such part of the income as the trustee may deem proper to pay them, and such payments to be made in such sums and at such times as the trustee might think proper.

The evidence also shows that Mrs. Bradford understood that she was devising to her grandchildren, after the death of their parents, the corpus of the estate in fee; but we find that the will as written, in paragraphs III and IV, only gives them so much of the net annual income thereof as the trustee may see proper to pay them, *"for and during the period of the minority of such child or children,"* and by paragraph VII of the will the grandchildren cannot come into the possession and enjoyment of the corpus of the estate *until the youngest grandchild "shall attain the age of twenty-one years, after the death of their said mother,"* . . . or *"father."*

And the defendant, Blossom, testified that he was

directed by the testatrix to not only draw the will so as to give the income of the estate to her children for life, and the remainder in fee to her grandchildren, but to so draw it as to make the trust cease upon their arriving at age, and at that time turn the corpus of the property over to them, free and discharged from the trust.

It will thus be seen that instead of giving the devisees the present enjoyment of the income of the estate, as the testatrix desired, the will was so drawn as to give her children only such part thereof as the trustee might deem proper to give them, which might be little or much, and empowered him to invest the residue of the income in real estate or other approved securities; and substantially the same provision was inserted regarding the grandchildren, excepting, however, they are absolutely deprived of the entire income from the time each became of age until the youngest, which may not yet be born, reaches the age of maturity, which might be a half a century from now.

These are only a few, yet are among the most important changes which were written into the will unbeknown to the testatrix, and they are so radically different from the disposition she thought she was making of her property that no court would be justified in holding it to be her last will and testament.

In the discussion of this question upon the former appeal, BURGESS, J., in strong and clear terms, pointed out some additional changes to those above mentioned found in the will, which, when viewed in the light of the devotion and affection the testatrix entertained for her children and grandchildren, show how unreasonable and unnatural are the provisions of the will in question. His language is as follows:

"If the contingency mentioned in the seventh clause of the will should arise, the executor might hold the property and dispose of the income from it as

he might see fit during the lives of Frank and Carrie, children of the testatrix, and after their deaths, if both of them should leave children, until the youngest of their children should have reached the age of twenty-one years. In the event of this contingency, after the death of the trustee, his representatives or assigns would be drawing commissions upon the property mentioned in the will; and all of the grandchildren of the testatrix, after the death of Carrie and Frank, who have reached the age of twenty-one years, would be deprived of the enjoyment of the property until the youngest child of each arrives at the age of twenty-one years.

"In the event of the contingency mentioned in the third paragraph of the fourth clause of the will, the trustee would be entitled to hold the property and draw the commissions for handling the income of the same during the lives of Frank and Carrie; and if both should die, and Frank leave no children or descendants of children, and Carrie should leave children, then during the natural lives of all the children of Carrie, until they became extinct.

"By this paragraph of the will the trustee is given the power to hold the property during the lives in being, Frank and Carrie, and during the lives not in being—of children which might be born of Carrie after the death of the testatrix." [Bradford v. Blossom, 190 Mo. l. c. 140.]

This precise question came before Division One of this court in the case of Cowan v. Shaver, 197 Mo. 203. In that case the testator intended to give his property to his wife for life and the remainder to his children in fee, but the scrivener in drawing the will gave to each of the children thirty dollars and the balance of the estate to the wife in fee. In speaking for the court, VALLIANT, J., said: "But it is immaterial

207 Sup.—15

what the scrivener thought about it, if the illiterate, feeble old man told him to write it one way and he wrote it another, and it was signed under the belief that it was written as he directed, it is not his will.'' And in this connection, when this case was here before, Judge BURGESS said: ''So far as this record shows, there is not a scintilla of evidence which tends to show that Mrs. Bradford ever knew anything about the contents of this will or the changes that were made in the original draft thereof, and all that the record discloses, so far as relates to her connection with the will, is the simple fact that she signed it and requested the attesting witnesses to sign it as witnesses to her will.'' [Bradford v. Blossom, 190 Mo. l. c. 141.]

The learned counsel for defendants do not controvert the rule of law above stated, but seek to evade the effects thereof in this case by contending that the record shows the testatrix had knowledge of all the facts and provisions contained in the will, and with that knowledge signed it; but that she and her friend and counselor mutually misunderstood the legal effect of those facts and provisions, as well as the law applicable to such a will. And it is therefore contended that this case is not governed by the rule announced in the Cowan-Shaver Case, supra, but is controlled by the following rule, stated in the case of Couch v. Eastham, 27 W. Va. 796, viz: ''The mistake which it will avail to set aside a will is the mistake as to what it contains, or as to the paper itself, *not* a mistake either of law or fact in the mind of the testator as to the effect of what he actually and intentionally did.''

The soundness of this doctrine is not questioned by counsel for plaintiffs and cannot be; the trouble with applying it to this case is this, there are no facts upon which it can rest. As said by Judge BURGESS, when the case was here before, there is not a scintilla of evidence in this record which tends to show the tes-

tatrix had any knowledge whatever of the provisions of or contents of the will she was signing. We have carefully read and reread the record before us upon that point, and have been unable to find any evidence tending to show she had any knowledge of the contents of the will as drawn, and, we, therefore, concur with the conclusions then reached by that learned judge.

Clearly, there was no mistake of law or fact in this case in so far as the testatrix and the trustee were concerned. She instructed him to draw her will, making certain disposition of her property; without her knowledge he had an entirely different will drawn, by his lawyer, which was fully explained to him by that lawyer; and, without reading, discussing or explaining the will to her, he had her sign and publish it as her last will and testament. Defendant Blossom testified that he read the will, had it explained to him, that he understood it, and that it was perfectly satisfactory to him. Upon this state of the record there is no room or foundation upon which to base a sound argument in favor of a mistake of any kind in so far as the testatrix and trustee are concerned.

We are, therefore, clearly of the opinion that the court committed reversible error in refusing to give instruction number one, asked by plaintiffs, telling the jury that the will propounded was not in fact the will of the testatrix.

Nor was that error of the court cured or rendered unavailing to plaintiffs because of the state of the pleadings. While it is true the petition does not allege that the testatrix instructed defendant Blossom to have her will drawn, disposing of her property in a certain way; and that in violation of her instructions he had a will drawn making a different disposition of her property, and, that, in ignorance of such change, she signed the will, believing it disposed of her prop-

erty according to the instructions given him, yet it does allege that defendant Blossom procured the execution of the will through fraud and undue influence practiced upon her, and concluded with a general allegation that the instrument in question was not the will of Emma Bradford, and prayed the court to frame one issue as to whether or not said written instrument was in fact her last will and testament.

Under our practice the proceeding to contest the validity of a will is a proceeding *in rem.* [Harris v. Hays, 53 Mo. 90; State ex rel. v. Guinotte, 156 Mo. l. c. 522; Sehr v. Lindemann, 153 Mo. l. c. 288.]

And the affirmative of that issue rests upon the proponents of the will, and they must establish the execution of the will and the mental capacity of the testator. [Harris v. Hays, supra; Sehr v. Lindemann, supra; McFadin v. Catron, 120 Mo. l. c. 269; Cowan v. Shaver, 197 Mo. 203.]

And it is no longer an open question in this State, "in view of our express decisions that upon the issues of *devisavit vel non* the court should take the proof and establish or reject the will, and that in such proceedings the contestants cannot take a voluntary nonsuit or dismissal." [McMahon v. McMahon, 100 Mo. 99; Benoist v. Murrin, 48 Mo. 48; Jackson v. Hardin, 83 Mo. l. c. 184; Hughes v. Burriss, 85 Mo. l. c. 665.]

And in discussing a similar question, in the case of Cowan v. Shaver, supra, VALLIANT, J., in an able and carefully considered opinion, said: "A will contest has its peculiar features. It comes after the will has been formally admitted to probate in the probate court, and it has the effect to throw upon those who assert the will the burden of proving it in the circuit court. The plaintiffs or contestants in such case may not introduce any evidence at all, they may even expressly abandon the contest, still the burden of proving the will devolves on those who would maintain it; they

must prove that it was executed as the law requires and that the testator had mental capacity to know and understand what he was doing. The proponents are not required to prove a negative, for example, they are not required to prove that there was no fraud or undue influence exerted, but they are required to prove every affirmative fact that is essential to the execution of a valid will, even though the contestants offer no evidence at all. If, therefore, in their efforts to prove the due execution of the will, the proponents themselves show that the paper offered is not what the testator was made to believe it was when he signed it, it cannot be adjudged to be his will, even in the absence of any averment to that effect in the petition of the contestants. The ultimate question in the case is, is this the last will and testament of the alleged testator? and the affirmative of that issue is on the proponents.'' [Cowan v. Shaver, 197 Mo. l. c. 212.]

And this is exactly what occurred in the case at bar—the proponents in trying to establish the writing offered as the will of Emma Bradford showed by the evidence of the defendant Blossom, and that of the attorney who drew the will and who was one of the attesting witnesses, that said written instrument was not what she was made to believe it was when she signed it, and for that reason it cannot be adjudged to be her will, even in the absence of such an averment to be found in the petition.

II.  And the conclusion reached in paragraph one of this opinion is made to appear more clearly when viewed in the light of the ruling of this court when the case was here before. Judge BURGESS, in delivering the opinion of the court, in substance, said that Mrs. Bradford was a weak and delicate woman, had much confidence in the business capacity and judgment of defendant Blossom, and consulted him about her business affairs, and when she had any business of extreme

importance she would advise with him, which, taken in connection with the changes made in her will, at least calls for an explanation from him. The judgment was reversed and remanded for a new trial, giving him an opportunity to make the explanation; but what did he do? He went upon the witness stand and testified that he consulted with her about the provisions of her will, and stated that she told him that she wanted to devise the income of her estate to her children for life and the corpus of the estate to her grandchildren in fee; that with those directions he had the will in question drawn and sent to her by mail; that he never showed to her the memoranda he drew up and gave to his attorney, nor the rough draft of the will prepared by the attorney. Neither did he discuss either with her, or explain to her the meaning of the provisions of the will as finally drawn, or that there had been any change whatever. And, as before stated, there is no evidence in this record which tends to show that she ever read the will or had any knowledge of its contents except the fact that he testified that it was sent to her by mail, either by himself or Mr. Thompson, and that she must have had it in her possession for a week or ten days. This explanation of his does not explain why she executed a will so radically different from the one he says she directed him to have drawn for her.

The evidence in this case clearly shows that the relation of trust and confidence existed between him and the testatrix at the time of the execution of the will, which fact taken in connection with the interest he and his wife took under the will shifted the burden of proof upon him to show by a preponderance of the evidence that she not only had the opportunity of reading the will but that she did read it and understood its provisions and what disposition she was making of her property. It was also incumbent upon him to show that she acted freely, from her own volition, and

that the execution of the will was not the result of fraud or undue influence perpetrated upon her.

All of the authorities are one way upon this question, and support the views above stated.  [Roberts v. Bartlett, 190 Mo. 1. c. 699; Bradford v. Blossom, 190 Mo. 110; Garvin's Admr. v. Williams, 44 Mo. 465; Street v. Goss, 62 Mo. 1. c. 228; Maddox v. Maddox, 114 Mo. 1. c. 46; Gay v. Gillilan, 92 Mo. 255.]

The defendant having completely failed to comply with this rule of law, it then became the duty of the trial court to direct a verdict for the plaintiffs.

III.  The next assignment of error is equally fatal to the validity of the will, and that is the defendant Blossom, without the knowledge or consent of the testatrix and in violation of her instructions as to how it should be drawn, had the will so drawn as to violate the rule of law against perpetuities.

On cross-examination Blossom testified that it was the testatrix's desire to devise the net income of the property to her children, Frank and Carrie, during their lives, and the remainder to their children, and that the trust was to cease when said children—that is, the grandchildren of testatrix—became of age, and at that time the property was to be turned over to them, discharged from said trust and free thereof; but instead of having the will drawn so the property would be liberated from the trust when the grandchildren became of age, he told his lawyer, Mr. Thompson, "that Mrs. Bradford had made a will that was not satisfactory to him, and that he wanted another will drawn." And his instructions upon that point is best told in his own testimony.

"Q.  In the conversation that you had with Mr. Blossom was there anything said in the conversation, I mean outside of this memoranda, about tying this property up for any length of time?    A.  Yes, sir.

"Q. What was said about that? A. He wanted it tied up and he wanted to have the control of it as long as the law would permit, and if you will look at these memorandums here, you will find that I had to correct those memorandums in order to avoid the rule against perpetuities.

"Q. And there was a conversation between you and Mr. Blossom in which he expressed the desire to have this property tied up as long as the will would permit it? A. Yes, sir; and furthermore, he drew this clause—that was not in my draft of the will—this clause here marked 9 in regard to the succession of the trustee.

"Q. Do you refer to the clause where he can appoint a successor either in writing or by a last will and testament? A. Yes, sir."

And on re-direct examination, he testified as follows:

"Q. Mr. Thompson, did not you understand that Mrs. Bradford wanted those things in there? Did not you understand that from Mr. Blossom? A. I would not like to say that.

"Q. Do you mean to say that you would draw up a will for an old lady and send her a bill when you did not understand it to be the will that she wanted? A. No, sir; I do not say any such thing. I never saw this lady, in any way, shape or form.

"Q. I did not ask you that? A. Mr. Blossom came there with his own memorandum for me to make the will in accordance with his memorandum, and they were made by him and not by her.

"Q. I ask you whether you did not understand from him that what he told you represented the desire and the will of Mrs. Bradford? A. I can not say that.

"Q. Did you not believe when you were drawing up the will that it was such an one as Mrs. Bradford wanted? A. I cannot say that, Mr. Lehmann. I would

not say that under any circumstances unless she was present and approved it.

"Q.   And did not you believe it to be her will?   A. Well, now, if you ask me my belief, I will say no.

"Q.   You did not?   A.   No.

"Q.   And yet you signed that probate?   A.   Yes.

"Q.   And sent her a bill for it?   A.   Certainly, because I didn't think she understood those clauses in that will, not any woman would understand it."

In pursuance to the memoranda and instructions given him by Mr. Blossom, Mr. Thompson drew the will in question, which this court held, on the former appeal, to be violative of the law against perpetuities, and which counsel for defendants, in their printed argument herein, admit is offensive to that well-known rule and wise provision of the law.

While the petition is silent as to any allegation of facts which would put in motion the rule against perpetuities, yet no such question of pleading was raised on the former appeal, nor in this one; but, nevertheless, there is a grave doubt as to whether or not the court, under that state of the pleadings, would have the power or jurisdiction to adjudge the will void because it violates the rule against perpetuities.

If that question had been properly pleaded, there can be no doubt but what this court would have been compelled upon the authority of the cases below cited to have held the will void for that reason.   [Lockridge v. Mace, 109 Mo. 162; Shepperd v. Fisher, 206 Mo. 208.]

However, this court has the undoubted power to point out and emphasize the change made in the will by defendant Blossom, and so radical is it in its nature that it would vitiate it at any time in the future should the question ever be properly presented to the court. And this change of a valid will, without the knowledge or consent of the testatrix, to an invalid one, it would

seem, was made solely for the purpose of tying up the estate and placing it under the control and management of the trustee and his successor and appointee for a great number of years. But whatever may have been the motive which prompted the change, it was nevertheless made, and that, too, without Mrs. Bradford's attention having been called to it, and she was thereby induced to sign a paper which was not in fact her will; and under the authority of Cowan v. Shaver, supra, this change, whether made fraudulently or otherwise, was sufficient to and does nullify and destroy the paper as the will of the testatrix.

IV.   There are many other errors complained of by plaintiffs regarding the giving and refusing instructions; the admission and rejection of evidence; and the argument of counsel to the jury; but, in view of the conclusions reached by this court in paragraphs I, II and III of this opinion, we deem it entirely unnecessary to pass upon the other assignments made.

For the reasons before stated the judgment of the circuit court establishing the will is reversed and the cause remanded, with directions to enter judgment rejecting the will and holding it for naught.

All concur except *Graves, J.,* who concurs in reversing and remanding the case, but is of the opinion that there is sufficient evidence to require the submission of the case to a jury, where one is demanded, and for that reason dissents as to the direction to the lower court to enter up judgment.

The death of Howard Blossom, one of the respondents herein, having been suggested and it appearing to the satisfaction of the court that his death occurred since this cause was submitted; it is therefore ordered that the circuit court of the city of St. Louis enter the judgment as above directed, as of and for the 11th day of June, 1906.