WILLIAM E. KNADLER, Administrator of Estate of GOTTLIEB KNADLER, v. MARY STELZER, Appellant.—19 S. W. (2d) 1054.

Division One, July 30, 1929.

.500

*Strop & Silverman* for appellant.

502

*John S. Boyer* and *John Muster* for respondent.

RAGLAND, J.—Gottlieb Knadler died in Buchanan County on the 27th day of July, 1924, at the age of eighty-three years. He had been blind for thirty-five or forty years, and during all of that time had made his home with his half brother, Christian Stelzer, and the latter's wife, Mary Stelzer—the defendant in this case. A little more than thirty days before his death he transferred to defendant notes and securities amounting to approximately $15,000, being all of the property that he possessed. He left surviving him as his heirs at law a half brother, said Christian Stelzer; a sister of the half blood, Catherine Springer; and nephews and nieces, children of David Knadler, a deceased brother of the full blood. At the instance of these latter, an administrator of his estate was appointed for the purpose of instituting this suit to set aside the transfer or gift of his property to defendant. Catherine Springer, being of the opinion that the gift by her brother of his property to the one in whose home he had lived so many years of his life was the thing naturally to have been expected of him, declined to participate in any of the proceedings looking to such a contest.

A somewhat fuller statement of the antecedent relations of the parties is necessary for a proper understanding of the questions raised with respect to the transaction in question. Gottlieb Knadler, called by his relatives and friends Caleb, never married: he made his home with his mother until her death, and thereafter with his brother Christian Stelzer. In 1875 he and Stelzer, while both were still liv-

ing with their mother, purchased jointly 240 acres of land in the neighborhood of their mother's farm. Soon afterward they divided the land, each receiving 120 acres, the part having all the improvements going to Stelzer. Presently Stelzer married defendant, and they, at his mother's request, came and made their home with her and Caleb. All of them then lived together as one family until the mother's death, which occurred nine years later. At that time Caleb was given his choice by Stelzer and David Knadler, who owned and lived on a farm nearby, as to which of them he would thereafter make his home with: he chose to live with Stelzer. Stelzer remained on his mother's farm for a year after her death: thereafter he moved with his family, including Caleb, to his own farm. They resided there until Caleb's death, July 27, 1924, and Stelzer's on August 11th, following: during the intervening years Stelzer and his wife reared a family of eight children.

As a member of Christian Stelzer's family Caleb Knadler received all the attentions and personal ministrations that dependence resulting from blindness was calculated to call forth. He sat beside Mr. Stelzer at meal time and was the first one served: Mrs. Stelzer laundered and mended his clothes and looked after his personal wants as though he were one of her children. He had an eager mind, which was constantly demanding information as to both local happenings and general events: in response to this need, Mrs. Stelzer talked to him hours at a time and read to him from newspapers and magazines, as did her children later on.

The children speaking to him or about him in the family called him Caleb, and he, following their manner of addressing their mother and father, called them "mama" and "papa." The record is silent as to any suggestion that there was ever a break, or even a coldness, in the cordial relations existing between Caleb and the other members of Christian Stelzer's family.

Caleb Knadler, notwithstanding that he was totally blind, led a relatively active life. He did many chores on the farm: cut weeds, husked shock corn, carried slop to the pigs, milked cows and sawed wood. He visited friends and relatives who lived in the neighborhood, walking to their homes. Among those whom he visited at regular intervals were the children of his deceased brother, David Knadler: he remained on terms of cordiality with all of them throughout his life.

In addition to his physical activities, Knadler rented his land and loaned money which he had or accumulated from sources not disclosed by the record. As security for the loans he took deeds of trust on lands in the neighborhood in which he lived. He managed all these transactions himself without consulting or advising with any one. Persons who wished to rent his land applied directly to him:

he rented corn land for cash and the wheat land for part of the crop. Tenants in paying cash rent would hand it to Stelzer in Knadler's presence: Stelzer would count the money and then turn it over to Knadler, who would take it to his bedroom and put it in a private box which he kept there. He was always present at the threshing machine when the wheat grown on his land was divided, Stelzer being present, however, to verify the count. Persons desiring loans also applied directly to him and he determined for himself whether he would make them. Stelzer invariably looked after the execution of the papers; caused himself to be made trustee in the deeds of trust; and released them of record when the loans were paid. As a rule interest and principal were paid to Knadler in the same manner as was the cash rent: occasionally interest or rent would in his absence from the house be left with Mr. or Mrs. Stelzer. He kept the notes and deeds of trust in his possession in the private box just referred to: payments made on account of principal or interest were always indorsed on the notes by Stelzer.

Knadler had an account with a bank in St. Joseph, which consisted of a record of time certificates of deposit and Liberty Bonds. The account was kept in the name of Gottlieb Knadler by Christian Stelzer. All transactions with the bank were conducted by or through Stelzer.; he deposited the money, obtained the certificates and cashed or renewed them as they matured. All indorsements on the certificates were made by Stelzer in this manner: ''Gottlieb Knadler by Chris Stelzer.'' The time certificates were always kept by Knadler in his box: the Liberty Bonds were left in the custody of the bank. Knadler had no checking account. From the bank's records it appears that in two instances a portion of the proceeds of one of Knadler's time certificates found its way into the checking account of Stelzer: $300 at one time and $400 at another. No explanation of this was forthcoming at the trial, Stelzer being dead at that time.

On July 1, 1915, one Hines and his wife, the son-in-law and daughter of Stelzer, executed and delivered to Knadler their note for $5,000, secured by a deed of trust on Hines's land. The note and deed of trust covered a loan of $4,000 made on that day and an unsecured loan of $1,000 made previously. On February 17, 1919, the deed of trust was released of record by Stelzer as the legal holder of the note. The note was not paid, but in lieu of it Hines and his wife gave their personal unsecured note to Gottlieb Knadler for the sum of $5,406.94, representing the principal of the $5,000 note and accrued interest. With respect to these matters Hines testified:

''When I was about to sell a part of the property, I saw Mr. Knadler about getting it released. I did not talk to Mr. Stelzer about it. I told Mr. Knadler I wanted to sell a piece of land; that to give a good title to it, I would like to have the mortgage released, and he

said all right, go ahead and have it released. I told him I could not pay him at that time. The piece I was selling had the house upon it, and after that I did not have another place to live in upon the rest of the tract. I told Mr. Knadler that I would have to build a house on what I had left, and he said that was all right, that if I wanted the money to keep it and I could pay up when I got it. So far as I know, no member of the Stelzer family solicited Mr. Knadler to make me either loan, or to release this land, or anything at all in connection with my loans. I transacted all the business myself with Mr. Knadler.''

On March 24, 1924, Knadler owned ninety acres of land: a portion of his original 120 acres had been appropriated by a railroad company for a right-of-way and he had sold and conveyed fifteen acres to Stelzer many years before. This remaining ninety acres, worth approximately $11,000, he conveyed on the date just mentioned to Mrs. Stelzer, as a gift. The circumstances leading up to and attending this transaction, as testified to by Mrs. Stelzer and her son, Clarence, were as follows: Several days prior to the day on which the deed was made Knadler said to Mrs. Stelzer: ''I want to give you—deed you my land, as it is just a bother to me. I don't want to bother with it any more.'' He further told her to have her husband attend to it. Later on, possibly the same day or the next, he suggested that Clarence Stelzer take him and Christian Stelzer to St. Joseph to attend to the making of the deed. Clarence asked about the description of the land: Knadler thought it could be obtained from the old deeds. Finally, it was agreed that Clarence should see an abstracter when he next went to town and ascertain whether a correct description could be gotten from the records. This was done, and Clarence later reported to his uncle that a survey was necessary. The latter told Clarence to have the survey made. When that was done Clarence took the description obtained from the survey to a scrivener and directed him to prepare the deed. When the deed was ready Clarence took his father and uncle to town, where the latter signed and acknowledged the instrument. On returning home from town, Knadler handed the paper to Mrs. Stelzer, saying: ''Here is your deed.''

The scrivener testified that when Knadler came into his office he walked very slowly and seemed to be a little feeble; that Clarence Stelzer had his arm; that he, the scrivener, was unable to engage Knadler in conversation; and that after he had explained to him the nature of the instrument and asked him whether he understood what he was doing, Knadler merely nodded his head. He further testified that Knadler's appearance of feebleness may have been due to his blindness and the strangeness of his surroundings. Knadler was also quite deaf at that time as will more fully appear further on.

One of the Stelzers, either the father or the son, paid the surveyor and scrivener for their services in connection with the making of the deed.

On February 18th, a little more than a month prior to the deed transaction, Knadler had occasion to get a cap or hat on the top shelf of a wardrobe which was in his bedroom. He pulled out a drawer at the bottom of the wardrobe, stepped up on it and was in the act of reaching up for the desired article when the wardrobe tipped and fell forward. One of the doors swung open and received the weight of the receptacle as it struck the floor. Knadler sustained slight bruises, but suffered no serious injury. On May 24th following, a physician was called to see Knadler. The diagnosis then made disclosed that Knadler had Bright's disease: his urine showed albumin; his feet and legs were swollen, and there was considerable fluid in the peritoneal cavity. The physician could not tell whether the disease had existed for some time, or had just developed. He prescribed for his patient, but was not called again. Shortly thereafter the swollen condition of the feet and limbs abated, and Knadler went about as usual.

On June 18th, following the short illness which had been diagnosed as Bright's disease, Knadler through a fall suffered a fracture of the right hip. On this occasion another physician, Dr. G. F. Kimball, was called to attend him. The physician found his patient suffering some pain; he placed him in bed and applied an extension to his leg, but gave him no medicine. The next day, or the one after, he installed a nurse who remained in constant attendance on Knadler until his death, July 27th; during that time Kimball himself came every day or every other day. Concluding on the second day that his patient would not recover in any event, owing to his advanced age, Kimball directed the nurse to remove the extension which seemed to be worrying him. Kimball testified at the trial that Knadler during the first week following his fall, while suffering some pain from the fracture, rested quietly and was entirely normal so far as his mental faculties were concerned. Within that week, and on the 24th day of June, he signed and delivered the writings which plaintiff seeks to have annulled in this proceeding. The facts and circumstances attending the execution of the contract and the contemporaneous delivery of his property by Knadler to defendant must be gathered solely from the testimony of witnesses called by the defendant: the defendant herself, the members of her family, her attorney and the physician and nurse who were in attendance.

The next day after Knadler was hurt (Thursday) he asked Herman Stelzer, a son of defendant, to call his mother. When she came up from down stairs, she said: "What do you want Caleb?" and he said, "I want to give you the rest of my property for the care and

good home you have given me." She asked, "When," and he said, "Well, now." She then inquired: "Who must do that for you?" and he said, "Papa." She then called Mr. Stelzer upstairs and repeated the conversation to him. He turned to Caleb and asked whom he wanted to attend to the matter, and the latter said, "I want you." Stelzer then told him that he was going to town on Saturday to see a doctor and that he would attend to the matter at that time. On Saturday afternoon Stelzer appeared at the office of Mr. Joseph Goldman, an attorney, in St. Joseph, and told him "that he (Stelzer) had a brother at home who desired to have an agreement drawn up in reference to disposing of some personal property," and requested Goldman to go and see him. Goldman had known Stelzer for many years and had been his legal adviser in various matters, but he had no acquaintance with Knadler. Later in the afternoon of the same day he went to the Stelzer home and was taken up to the sick room by Stelzer who said: "Caleb, this is Mr. Goldman, your attorney." What transpired thereafter will be told in Mr. Goldman's words as they appear in the abstract of his testimony:

"After visiting with him a while I asked him what he wanted me to do. He said he wanted me to draw up an agreement transferring whatever personal property that he had or belonged to him at the time. I inquired of him to whom he wanted to give it. I did not inquire at that time into the reason why he wanted to do that, but later I did. Later he said that he wanted Mrs. Stelzer, 'Mama'— Mama, he said, took care of him for a good many years, and that she was very much like a mother to him, that he felt that he wanted to give it to her. Then I inquired what property he had, if I could see the contents of it, in order that I could properly make a notation of it. I asked him about real estate, and he said that he had transferred his real estate to Mrs. Stelzer some months prior to the time I was there. I inquired what property he owned and he said that he had some money in the American National Bank on certificate of time deposit, that he had several Liberty Bonds, that he had several notes secured by mortgages—he used the word 'mortgages' and that he had several notes, I believe, that were unsecured. He and I went over what property he had—what notes he owned and property. We had the papers before us at the time we went over it. . . . He called to some one to bring his box . . . it was brought and put on his bed almost in front of his lap. I think the nurse was present at the time he and I were talking the matter over. None of the family remained in the room while I was talking with him. There was a sick chamber to the north of the room that Mr. Knadler was in, and members of the family walked in and out, but I paid no attention and don't know which ones it was. I afterward learned that a son was sick in that other room. After the box was delivered to

Mr. Knadler it was handed to me and I started to examine its contents. I found notes secured by deeds of trust, and unsecured notes. It seems to me I found a receipt from the American National Bank for some Liberty Bonds and I found certificates of deposit, tax receipts and other receipts. When I would take up a note I would read the note to Mr. Knadler and ask him if it was his property and he would answer that it was. I made a memorandum of the papers and incorporated a description of the securities in the written contract that I prepared. Mr. Knadler informed me that he wanted to transfer the property to Mrs. Stelzer. He wanted a clause in the contract, and he laid special stress on that, that he should have proper burial and a monument, and also wanted something mentioned that in the event Mrs. Stelzer died her heirs should care for him the same as she had. His mind was clear and bright.''

On the afternoon of the following Monday, June 24th, Goldman returned to Stelzer's with a contract, typewritten and in duplicate. He gave the nurse one copy to hold and follow as he read from the other to Knadler. After the contract had been read to him, Knadler said that he understood it and that it was what he wanted. He was then propped up in bed by the nurse and with the assistance of Goldman, or a notary who was present, signed by mark. Dr. Kimball was present at the signing, and he, the nurse and Goldman attested the signature. Mrs. Stelzer was then called in, the contract was read to her and she signed it. The acknowledgments of both signatories were taken and certified by the notary. An assignment indorsement on the back of each of the securities mentioned in the contract was signed by Knadler and his signature attested in the same manner followed with respect to the contract. After the papers had been signed and attested they were handed by Goldman to Knadler, who thereupon delivered them to Mrs. Stelzer—all being done in precise form.

The contract just referred to purported to be between Gottlieb Knadler and Mary E. Stelzer. According to its terms, he gave, transferred, set over and delivered to her, to be hers from and after the signing of the instrument, certain securities which were particularly described; in consideration thereof she on her part covenanted to continue to render him the same services which she had been rendering him ''during the last forty years,'' and to furnish him a proper burial and erect a monument ''to mark the last resting place of his remains''—these covenants to be performed by her legal representatives should he survive her. There were some preliminary recitals to the effect, that he had been afflicted with blindness for forty years, during all of which time she had bestowed upon him all the services and attentions which were necessary for his comfort, well being and enjoyment; that the only remuneration she had ever received for

the services and attentions so bestowed was the conveyance of land on March 24, 1924; and that he desired to make further remuneration. The language of some of these recitals, respondent insists, carries on its face evidences of fraud. As for example:

"Whereas, said first party hereto is fully aware of the great value to him of the aforesaid services so rendered by said second party during all the time and times hereinbefore mentioned during his great afflictions.

"And

"Whereas said first party is desirous of making other and further remuneration to said second party for the kindly services which she has rendered to him, and especially is this deemed proper and fair and conscientious on account of the fact that a few days ago said first party received severe and lasting injuries.

"And

"Whereas said first party is fully cognizant of each and all of the parts of this agreement and accepts each and every one of its terms.

"And

"Whereas the said second party is fully aware of the physical and mental condition of said first party."

Mrs. Stelzer testified that she never charged Caleb anything for what she did for him and had never received any remuneration therefor prior to his deeding his land to her; that so far as she knew there was no understanding, agreement or arrangement between him and her husband by which he was to pay for his board or make any contribution whatever to the family support; and that she had no knowledge of his ever having made any such payment or contribution. The various members of the Stelzer family who were called as witnesses said that they never at any time during their uncle's life knew or heard of his paying anything for his board or support. However, a neighbor woman testified that she was told by Knadler some years before his death that he was paying the Stelzers $200 a year for his board. It further appears from the evidence that Stelzer was a man of few words, and that neither he nor Knadler ever discussed their business affairs with, or in the presence of, the family.

About thirty years prior to his death Knadler made a will, by the terms of which his estate was to go to his brother David, his half brother Stelzer, and his half sister Mrs. Springer, in equal parts, except that Mrs. Springer was to have $200 more than the others. In May, 1924, a neighbor, who had been a subscribing witness, asked Stelzer in the hearing of Mrs. Stelzer what Knadler had done with the will, and Stelzer replied he still has it.

So far as the record discloses none of the members of either the Stelzer or the David Knadler family is rich; neither is any of them

destitute or in straitened circumstances. They are all substantial folk and on somewhat of a parity, so far as material interests go.

The foregoing fairly summarizes the evidence, excepting certain phases of it which are reserved for consideration in connection with the legal questions to which they relate.

The petition charges physical and mental incapacity of Knadler, undue influence exercised by defendant, her husband, agents and attorneys, a confidential relationship existing between deceased and defendant and the members of her family, and a conspiracy on the part of defendant and the members of her family to deprive Knadler and his heirs at law of his property.

The answer is a general denial.

After hearing the evidence the trial court found that Gottlieb Knadler "did not have sufficient mental capacity to execute said purported agreement and assignment, . . . and that said purported agreement and assignment and the purported execution thereof were procured by the act of the defendant and those acting for her." Based on such finding, a decree was entered annulling "the purported agreement and assignment between Gottlieb Knadler, deceased, and Mary Stelzer, defendant, . . . dated June 23, 1924." From such judgment and decree defendant prosecutes this appeal.

The record first presents for solution the question: Did Knadler have sufficient mental capacity to make the contract of assignment in controversy? and if that be answered in the affirmative, then the further question: Was such contract obtained from him through fraud or undue influence?

I. It stands conceded that Knadler was a man of at least average intelligence, and the record is barren of any evidence that there had been any noticeable diminution of his mental powers up to the time he sustained the injury to his hip. The contention that he was deficient in mental capacity after receiving that injury is based largely on evidence as to his then physical condition. He had been partially deaf for five or six years, perhaps longer: at the time of his last illness his inability to hear seemed to be somewhat more pronounced. He had no trouble in hearing or understanding what was said to him by members of the Stelzer family or others who were accustomed to talking to him; but it was extremely difficult for those not so accustomed to carry on a conversation with him. This physical disability is mentioned as tending to throw some light on the evidence to be now noted.

On Sunday, June 22nd, and again on June 25th, the next day after a windstorm had caused considerable damage to property in the vicinity of the Stelzer home, including his dwelling, Knadler's relatives, friends and acquaintances from the surrounding neighbor-

hood came in great numbers to visit him—some of them to view the ravages of the storm as well. On both occasions some of the visitors were admitted into Knadler's presence, while others were permitted to go only to the open door of the sick room. Some of these latter testified that Mrs. Stelzer, or one of her sons in her presence, assigned as reasons for not admitting them statements said to have been made by the nurse to the effect that Caleb's pulse was too intermittent, that he was very low and that he was not expected to live through the night. Many of the persons who saw Knadler on the days just mentioned, including some who went into the sick room and some who remained at the door, testified that he was very restless, that he was moaning and groaning as though in great pain, that in order to make him understand what was said to him one had to place one's mouth within a few inches of his ear and shout, and that even then no intelligible response could be elicited. One of them testified that the sick man seemed to be in a dazed condition. Almost an equal number of other persons who saw Knadler on the same occasions testified that they heard no moaning or groaning and saw no indications of his suffering pain, that he appeared to be resting quietly, that he could hear what was said to him without placing the mouth close to his ear, if one spoke in a tone a little louder than the ordinary, and that his responses were sensible and intelligent, clearly indicating that he understood. These latter witnesses were corroborated by both the attending physician and the nurse. The latter testified, however, that on the two occasions just mentioned she did give instructions for the visitors not to be admitted. Dr. Kimball testified:

"During my attendance upon Mr. Knadler I talked with him, was able to converse with him, was able to make him hear me and he replied to me. His replies were audible. When I first saw him he suffered some pain. Of course on moving or handling he would suffer. When lying quiet he did not seem to suffer very much pain. I did not administer any narcotics. When I first called I asked the questions that were necessary to find out relative to his condition. He answered intelligently and I observed nothing indicating any impairment of mental faculties. He was rational. During the first week I attended him I would say there was no change in his condition. During that time there was no change that I could observe in his hearing or speaking. I conversed with him at various times during that week. The treatment given him was placing him in bed, rest, and an extension on his leg. I kept the extension on his leg two days and then removed it. During that first week he would naturally suffer some pain, but it was not pain that he needed any medicine for. His pain was not such as to destroy his reason or impair his mental faculties. During that first week he was in full possession of

all his faculties. During the time I was attending him I saw him at least every other day, and possibly oftener than that part of the time. During that first week his respiration was good and there was no time during that week that he was bloated or gasping for breath. He had sufficient mind and intelligence to know and understand what property he had and to know and understand to whom he owed any debt of gratitude or felt any obligation to."

According to the great weight of the evidence, Knadler, at the time in question, had the requisite mental capacity for making disposition of his property either by will or by a contract of the character of the one in controversy. And we so hold.

II. There is no direct evidence that over-persuasion, coercion or fraud, whereby his free agency was destroyed, operated to cause Knadler to make what was in effect a gift of his property to his sister-in-law. She testified that she had never at any time requested him, or even suggested to him, that he will or give her any of his property; and her children, grown sons and daughters, testified that they had never in their lives heard their father or their mother or any other member of the family say anything to their uncle respecting the disposition that he should make of his property either in his lifetime or at his death. (On one or two occasions, however, they had heard him say, without mentioning any names, that he intended to leave what he had to the ones who had done the most in caring for him.) Nor did any other person, so far as the record discloses, attempt to influence him in any way regarding the disposition of his estate.

But undue influence can seldom be proved by direct evidence; its existence and baneful exercise, if there were such, must ordinarily be inferred from the circumstances attending the transaction in question. We come next, therefore, to a consideration of the evidence from that angle. The most significant fact of all, perhaps, is the fact that Knadler, while yet alive, gave all that he possessed to the appellant. Was that an unnatural or an unreasonable thing for him to have done under all the circumstances? He undoubtedly sensed his own approaching end; he would have no further use for his property; his sister-in-law had bestowed upon him all the services, care and physical protection that he had required for forty years, and would without question continue to do so during the short period of his life that remained; he was under no particular moral obligation to any other person; no one was dependent upon his bounty. Why should he not therefore give his property to her, as he had purposed to do for many years? Was it not the natural thing for him to have done—the thing that he ought to have done, as his sister, Mrs. Springer, thought?

But it is said that Stelzer not only went in person for an attorney to prepare the papers, but that he selected his own attorney for the purpose. No particular significance can be attached to these circumstances. Knadler required a messenger: he could not leave his sick bed to find one outside the family. Stelzer had had notes, deeds of trust and other papers drawn for him many times: it was entirely natural that he should have commissioned Stelzer to attend to the matter then in hand. Knadler had never had any contact or acquaintance with lawyers: it was not strange therefore that he directed Stelzer to select one. Nor is there anything remarkable in the fact that Stelzer selected one who had theretofore satisfactorily represented him in various matters: had he hunted out a stranger the circumstance would now no doubt be regarded as highly suspicious.

Members of the David Knadler family complain that they were not told of their uncle's intention to give Mrs. Stelzer his property, or that he had done so after the fact. There is not a particle of evidence that any effort toward concealment was made. The transaction was conducted openly: the doors of the room were spread wide: the doctor, the nurse, the attorney and the notary were present: the members of the family came and went at will: none of them was enjoined to secrecy. The fact that public proclamation was not made cannot be regarded as unusual.

The extraordinary preamble and some other of the legalistic sophistications of the contract are the only features of the evidence that have given us any concern. A careful consideration of the record as a whole, however, has satisfied us that Knadler merely told his attorney that he wanted to give his property to Mrs. Stelzer, and directed him to prepare such papers as were necessary to accomplish that purpose: that being true, the fact that the gift was effected through the similitude of a highly embellished contract is of no consequence.

The question of confidential relation has not been overlooked. Knadler was in every sense of the word a member of the Stelzer family. The relation existing between him and the other members of that family were close and intimate. Because of his blindness he was dependent upon them in an unusual way for the doing of the things that were necessary for his physical comfort and well being, and because of that fact he in turn became the object of unusual solicitude on their part. Such relationship, however, created no presumption that the gift to Mrs. Stelzer was brought about by the exercise of undue influence, either by her or by any member of the family in her behalf. [Bushman v. Barlow, 316 Mo. 916, 292 S. W. 1039, and cases cited.]

Knadler transacted his own business without any assistance from Stelzer, in so far as counsel or advice was concerned. Stelzer was his messenger, his amanuensis, his eyes—and but little more. This relationship, had it existed between Knadler and Mrs. Stelzer instead of between him and her husband, would not have put upon her the onus of showing that the gift to her was a valid transaction. [Spurr v. Spurr, 285 Mo. 163, 226 S. W. 35.]

The evidence demonstrates beyond question that there was ample opportunity for the exercise of undue influence, but it fails to establish, either directly or through presumption, that such influence was in fact exercised. A decree setting aside and annulling the transfer of property, whether by way of gift or otherwise, on the ground of fraud or undue influence, must rest upon something more substantial than mere suspicion.

The judgment of the circuit court is reversed. All concur.