D. W. PATTON ET AL. v. OLIVER M. SHELTON ET AL., Appellants.—
40 S. W. (2d) 706.

Division Two, July 3, 1931.

632

S. S. *Nowlin* and *Reed & Beard* for appellants.

*James P. Boyd, E. L. Alford* and *A. H. Drunert* for respondents.

634

FITZSIMMONS, C.—This is an action under the statute (Sec. 537, R. S. 1929) to contest the validity of the will of Mrs. Nannie Shelton, deceased. For many years Mrs. Shelton lived and in February, 1927, died in Jonesburg, Montgomery County. The action was begun there, but on application of plaintiffs the venue was changed to Warren County, where a trial was had. The jury by its verdict found that the purported will was not the last will and testament of Mrs. Shelton. Judgment was rendered accordingly. The motion for a new trial filed by Oliver M. Shelton, the sole beneficiary under the purported will, and its named executor, was overruled and he appealed to this court. The estimated value of the estate ranges from ten to fifteen thousand dollars. The plaintiffs and the minor defendant, Susie Mae Ellis, are Mrs. Nannie Shelton's sole heirs, they being descendants of Mrs. Shelton's brother.

Plaintiff Edward Patton is a nephew of Mrs. Nannie Shelton. He lives in Paris, Missouri, seventy-five miles by railroad from Jonesburg, Mrs. Nannie Shelton's home. The other plaintiffs and the minor defendant, Susie Mae Ellis, are grandnephews and grandnieces of Mrs. Nannie Shelton. Some live in Garden City, Kansas, and all of them at a distance from Jonesburg.

Defendant Oliver Shelton was a half-brother of Mrs. Nannie Shelton's husband, Frank Shelton. Oliver Shelton lived in Arkansas, until about May, 1926, when he took up his abode with the Sheltons in Jonesburg. He returned to Arkansas several times, but he made a fairly permanent home in Jonesburg, especially after the death of his half-brother, Frank Shelton, who passed away July 8, 1926. It would seem that whatever property Mrs. Nannie Shelton had to dispose of by will she inherited or received from Frank Shelton, her husband.

Mrs. Shelton executed the will in suit on August 7, 1926, and as before said, she died in February, 1927. Mrs. Shelton, by the will, directed the payment of all her just debts, and left the remainder of her property "to my brother-in-law (the half-brother of my deceased husband) Oliver M. Shelton." She appointed Oliver Shelton executor without bond.

The petition charges that Mrs. Nannie Shelton, who was about seventy-six years old at the time that she executed the will in suit, had been "feeble in health for many years, and in consequence of which she was weak and feeble both in body and mind;" that defendant Oliver Shelton took up his residence in the Shelton home in Jonesburg some months before the execution of the will and while Frank Shelton, the husband of Nannie Shelton and half-brother of Oliver Shelton, was yet alive. The petition further recites:

"That after the death of the husband of the said Nannie Shelton, deceased, the said defendant Oliver M. Shelton remained in the home of the said Nannie Shelton, who was an invalid, and who had for many years been an invalid, and was her constant companion and nurse, and that by reason of his living within the home and nursing the said Nannie Shelton while she was an invalid, the said Oliver M. Shelton had gained full and complete confidence of the said Nannie Shelton, and complete influence over her."

The petition further charges that at the time of the execution of the will in suit, Nannie Shelton, deceased, was completely under the influence, domination and control of defendant Oliver M. Shelton; that she was not of a determined mind and that her mind and memory had become and was impaired; that she had become of unsound mind within the meaning of the law, incapable of understanding, realizing, or appreciating what disposition she had or was making of her property and affairs; "that defendant Oliver M. Shelton, knowing the exact condition of the said Nannie Shelton, deceased, and of her mind at said time, and knowing that, at the time, by reason of his nursing and caring for her and living within her home, and the confidential relation existing between himself and the said Nannie Shelton, deceased, and knowing that the said Nannie Shelton was weak in body and in mind, and was far advanced in years, by his request, entreaties and influence, over the mind of the said Nannie

Shelton, prevailed upon her to make said pretended will." The petition further charged "that the defendant Oliver M. Shelton well knowing the confidential relation existing between himself and the said Nannie Shelton and knowing his influence over the mind of the said Nannie Shelton and in violation of said confidential relation existing between the said Oliver M. Shelton and the said Nannie Shelton, did by words, acts and entreaties towards her, the said Nannie Shelton, unduly influence and prejudice the mind of the said Nannie Shelton against these plaintiffs and the said defendant Susie Mae Ellis," and thereby brought about the execution of the will.

Defendant Oliver M. Shelton, by his answer, set up that the will in suit was the last will and testament of Nannie Shelton. He put in issue the allegations of the petition that the purported will was not her will for want of testamentary capacity and by reason of his undue influence. The guardian of the minor defendant, Susie Mae Ellis, filed an answer adopting the allegations of the petition.

At the trial, defendant Oliver Shelton, proponent of the will, and as such having the opening and closing to the jury (Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S. W. 46; Benoist v. Murrin, 58 Mo. 1. c. 321) first made a prima-facie proof of the execution of the will and of the competency of Mrs. Shelton at the time. Thereby he shifted to the contestants the burden of evidence which had been his in the first place. [Campbell v. Carlisle, 162 Mo. 644, 63 S. W. 701.] The contestants then introduced their evidence, and at the close of plaintiffs' case it became the right of defendant Oliver Shelton to offer evidence in rebuttal and to fortify his prima-facie case. [Harris v. Hays, 53 Mo. 90.] But defendant offered no evidence in rebuttal and the case went to the jury with the result already stated.

At the close of the plaintiffs' case, defendant Oliver M. Shelton offered an instruction in the nature of a demurrer to the effect that the paper writing produced in evidence was the last will and testament of Nannie Shelton, deceased. The court refused to give this instruction.

The court gave several instructions at the request of plaintiffs. One of these instructions shifted to defendant, Shelton, the burden of proof that the will was not the result of his undue influence. This instruction applied to the facts of this case, hypothetically stated in the instruction, the presumption of law, sometimes indulged in will contests, that by reason of the confidential and fiduciary relation which Shelton bore to Mrs. Shelton, he exercised undue influence over her in the making of the will and the jury should so find, unless Shelton overcame this presumption by proving by the greater weight of the evidence to the reasonable satisfaction of the jury that such will was not induced by coercion or undue influence on his part.

The refused demurrer of defendant Shelton and the given instruction on the presumption of undue influence impose the duty to review the evidence. This review we shall make under classes or topics of facts rather than by resumes of the testimony of each witness.

1. As to Mrs. Shelton's physical and mental health and the care of her:

Dr. E. A. Ball and Mr. G. L. Wilson witnessed the will of Mrs. Shelton in her home at Jonesburg on the evening of August 7, 1926. After testifying on behalf of the proponent of the will, Oliver Shelton, as to its execution, Dr. Ball was cross-examined about her state of health. She had rheumatism for about twenty years and hardening of the arteries for ten years before she died. For a time after she had become rheumatic she was able to walk about, unaided, but soon she had to use canes, and later she had to sit in a wheel chair, when she desired to move. Her husband died on July 8, 1926, and Mrs. Shelton took to her bed a few days thereafter. She remained bed-ridden until she passed away in February, 1927. Her death was caused by cancer of the rectum. In answer to questions whether she had a normal mind in view of the fact that she had cirrhosis of the arteries and that she worried much after her husband's death, Dr. Ball answered: "She was a normal mind so far as her condition was concerned throughout. Her mind was as good as it ever was." And again: "I talked with her the day before she died and she talked just as rational as she had ever talked since I knew her, and I knew her from the time they were married up until her death." On redirect examination, Dr. Ball was asked: "Was her worry brought on by disease or was it brought on on account of the loss of her husband?" To which he answered: "I think the loss of her husband and the condition she was in when left alone without anyone to look after her and take care of her."

Mr. George L. Wilson, the second witness to the will, testified on behalf of Oliver Shelton as to the execution of the instrument. On cross-examination he said that after Mrs. Shelton became bed-ridden following her husband's death, he, Mr. Wilson, visited her "most every day." Oliver Shelton was there most of the time, sitting at the foot of the bed. He would give her the medicine and fetch her drinking water.

Edward Patton, nephew of Mrs. Shelton and the principal contestant, testified that he went to Jonesburg at the time of Frank Shelton's death in July, 1926. He remained a few days and returned to his home in Paris, as he had some work to do. He said that his aunt had had rheumatism for eighteen or twenty years; that she walked with the aid of canes; that later she used a wheel chair, and that after her husband's death she stayed in bed. In the early months after the death of Frank Shelton, Oliver Shelton was continuously

with Mrs. Shelton, taking care of her, and giving her the intimate aids which fall to the lot of those who wait upon the helplessly sick. Ed Patton was asked: "And you would stay how long? A. See how she was getting along and she would tell me she was feeling some better and as I was busy working, 'Go and do your work and come to see me if you can.' "

John E. Reeds, a banker at Jonesburg, testified on behalf of the plaintiffs. He was a neighbor of the Sheltons. They kept their money in his bank, and he attended to their private affairs and was administrator of Frank Shelton's estate. Frank Shelton for several years before his death had been afflicted and "had not been uptown." Mr. Reeds carried their mail to them from the post office, opened and read letters to them, and quite often he wrote their letters for them. He was at their home every night and morning. Oliver Shelton made his first trip to Jonesburg in May, 1926, after writing to his half-brother a letter of inquiry as to how to get there.

George L. Wilson, one of the witnesses to the will, called on behalf of defendant, Oliver Shelton, testified that Oliver had said he never had seen his half-brother, Frank Shelton, until he, Oliver, arrived at Jonesburg, Mo., from his home in Arkansas; that a fortune-teller in Arkansas told him, Oliver, that the Sheltons had property worth about $10,000; that both of them were very sick and would not live long, and he, Oliver, upon receiving this report from the fortune-teller "came up here (to Jonesburg) to see about them." Mr. Reeds further testified that Oliver stayed about a week, at the time of his first visit in May, 1926, and then returned to Arkansas. Of this first short visit of Oliver Shelton, to Jonesburg, Ed Patton testified to an incident which Oliver had narrated to him. The Shelton chimney had been struck by lightning. Oliver asked his half-brother Frank if his house was insured and Frank answered in the affirmative. Oliver proposed that Frank tell him the name of his insurance agent and he, Oliver, would put in a claim for the damages. Frank, the half-brother, responded: "I think you are taking too much authority; if you have a home to go to, you had better take your grip and go on." Oliver cried and he left for Arkansas. But he was again in Jonesburg in July, 1926, arriving a few days before Frank Shelton's death, in response to a letter from Mrs. Nannie Shelton, Mr. Reeds presumed. Another witness for the plaintiffs identified two letters from Mrs. Shelton to the defendant, asking him to come. Mr. Reeds testified that at about the time of the death of Frank Shelton, Oliver Shelton informed Mr. Reeds that Mrs. Shelton wanted Mr. Reeds to go to Warrenton, to hire a woman named Mrs. Bomar to wait upon her. Mr. Reeds and Oliver Shelton went on this mission. Of this journey more will be said under another topic. But it may be added here that Mrs. Bomar was hired and became a nurse for Mrs. Shelton. How long she remained does not appear. Oliver Shelton stayed with

Mrs. Shelton after her husband's death in July, 1926, until August or early September, when, Mr. Reeds testified, Oliver Shelton returned to Arkansas and remained until after the November election. He then returned to Jonesburg and stayed until the death of Mrs. Shelton in February, 1927. Mr. Reeds also testified that Oliver Shelton waited on Mrs. Shelton, went up town to make purchases for her and ran errands for her. Mr. Reeds attended to the fires for Mrs. Shelton during Oliver's absence in Arkansas in September and October.

Mrs. Cora A. Wilson, neighbor of the Sheltons, testifying on behalf of the plaintiffs, told substantially the same story as Dr. Ball of the years of suffering of Mrs. Shelton, and of the aggravation of her ailments and helplessness after the death of the husband, Frank Shelton. Of the care of Mrs. Shelton and of the old lady's own expectations Mrs. Wilson testified:

"I asked her before her husband died what she was going to do, that her husband was getting very old, and I said: 'Mrs. Shelton, I reckon you realize you are going to be left alone;' she said, 'Yes.' 'Well,' I said, 'What will you do;' she says, 'I am going to get Ed Patton and his wife to come and live with me.' I said, 'Can you get along with his wife;' she says, 'I can.' That was about two days before Frank Shelton died. Ed Patton was there at Frank Shelton's funeral, and remained a day or two after the funeral. I don't know that I ever talked to her about Ed Patton other than the conversation I spoke of. I have seen Oliver M. Shelton waiting upon her; waiting on her in a call of nature and giving her medicine. After Oliver M. Shelton was there he did most of the chores about the place, and went after groceries and things of that kind; Mr. Reeds' folks always helping out, doing something, and their little girl and different ones."

Mrs. John C. Reeds, wife of the banker, testifying on behalf of plaintiffs, said that after the death of the husband, Frank Shelton, she saw defendant Oliver Shelton give Mrs. Nannie Shelton medicine and drinking water, and aid the afflicted woman in answering a call of nature. Mrs. Reeds said that Mrs. Shelton always seemed to be a sensible and not a wishy-washy woman.

Mrs. Nannie Shelton was a cousin of Mrs. Carrie Morgan's father. Mrs. Morgan testifying on behalf of plaintiffs, said that Oliver Shelton would get the groceries, bring in ice for Frank Shelton when he was sick, and carry the water. She saw him give Mrs. Shelton medicine and turn her in bed.

2. Of the making of the will: In the order of time, Mrs. Shelton's will was first mentioned in a conversation between John E. Reeds, the banker and adviser of the Sheltons, and defendant Oliver Shelton on their way from Jonesburg to Warrenton to hire Mrs. Bomar to stay with Mrs. Shelton and to nurse her, as has been mentioned. That was in July, 1926, in the week following the

death of Frank Shelton, the husband of Mrs. Nannie Shelton and the half-brother of the defendant. The conversation on the road to Warrenton, as testified by Mr. Reeds, was as follows:

"Q. Did you have any conversation with him coming down that day in reference to a will? A. Yes; well, I think the first thing he asked me about what Mr. Shelton's estate would amount to; I told him that I really didn't know, that I had never made any estimate of it. He says, 'You have been looking after his business for sometime; you have some idea;' I says, 'Possibly so; I imagine it would run around ten thousand dollars.' 'Well' he remarked, 'that was what the fortune teller had said, somewhere from ten to fifteen thousand.'

"Q. Now, just tell what he said, not any conclusions, just tell it. A. Well, he asked me to use my influence with her to make a will and I remarked that I didn't think she was in any condition to make a will. At that time she was a pretty sick woman, I thought, and he asked me, he says: 'Don't you understand that if she was to die now that her nephew would get the estate?' I says: 'He probably would,' and he said, 'I can come here and take care of her, but I cannot afford to do it for nothing,' and he says, 'It might be worth your while to assist me in getting her to make a will.' I says, 'No, I don't think she is in any condition to make a will, and I don't care to be a party to anything of that kind.' That was about all there was to that."

We next hear of the will in the testimony of Mr. W. C. Hughes, a lawyer of Montgomery City. Mr. Hughes was one of the attorneys for the defendant Oliver Shelton, beneficiary and executor. Mr. Hughes took part in the trial, in behalf of defendant, but he was called as a witness by the plaintiffs. Outside the record it is a matter of knowledge that Mr. Hughes is now judge of the Eleventh Judicial Circuit, which includes the Circuit Court of Warren County in which this case was tried. Judge Hughes testified that Oliver Shelton visited him at his office in Montgomery City and said that Mrs. Nannie Shelton, the widow of Frank Shelton, had sent for Judge Hughes "to come to Jonesburg to write her will." Judge Hughes stated that he was very busy and did not have time to go to Jonesburg unless it was absolutely necessary. Judge Hughes further testified:

"I asked him if he knew what she wanted in her will. He told me he did, and he told me she desired to make a will to him. I then told him that that would be a very short will and it would save her expense as well as save me leaving my office for a half day for me to draft the will and send it to her and if it did not suit her for her to call me over the phone, or have him call, and I would come. Under those circumstances I prepared the will, gave it to him and he left."

Returning to the testimony of Dr. Ball, the family physician, and a witness to the will, someone, he did not know who, telephoned him to come to the residence of Mrs. Shelton. She was in bed and Mr. Wilson, the other witness, was sitting beside her reading her will. Either Mr. Wilson or Mrs. Shelton said to the Doctor "that they called me down there to attest her will." The Doctor further testified:

"Q. What was next said? A. Why we proceeded to prop her up in bed and she took pen and ink and signed it, and I asked her if she knew what she was signing and she said she did.

"Q. What was that? A. I asked her if she knew what that was and she said it was her will, her last will.

"Q. What caused you to ask that? A. Well, I just did it simply to see and know. To see whether she knew what it was.

"Q. What were you testing her for? A. I just wanted to know if she knew what she was signing, and she said it was her will."

Dr. Ball and Mr. Wilson signed the will after Mrs. Shelton had signed it.

Mr. George L. Wilson, the second witness to the will, in his testimony at the trial, said that Oliver Shelton called him to Mrs. Shelton's home on the night that the will was executed. He did not know why he had been called, but when he entered the house and passed on to the room in which Mrs. Shelton lay sick, she produced the proposed will and said that she desired him to witness it. Dr. Ball arrived. Mrs. Shelton signed the will and Mr. Wilson and Dr. Ball signed it as witnesses. Oliver Shelton was not present in the room when the will was executed. Dr. Ball testified that when he arrived Shelton met him at the door of the house and let him in, but Shelton did not enter. Mr. Wilson did not see Oliver Shelton that night. Mr. Wilson testified that, after the death of Mrs. Shelton and when a will contest suit was being threatened, Oliver Shelton and Mr. Reed, one of his lawyers, visited Mr. Wilson. The latter did not recollect all that was said at the conference, but at one point Oliver Shelton said: "That's right, because I was in the other room and heard every word that was said." Judge Hughes in his testimony as a witness for plaintiffs in answer to a question tells of the further disposition of the will:

"Well, at the time Mr. Shelton was in my office he asked me what to do with the will after she executed it, and I told him just to leave it any place it could be found or give it to me, or leave it with anyone; and I pointed out my safe in my office, that if she desired to send it to me I would put it in my safe; some two or three weeks later the will was brought back or mailed back to me, and placed in my safe, and that was the last I saw of it until after Mrs. Shelton's death."

The will was executed August 7, 1926, and Edward Patton, the principal contestant, testified that defendant Oliver Shelton, some-

642

time in September, informed him that Mrs. Shelton had made a will in his, Oliver Shelton's, favor. Shelton was absent in Arkansas in September and October, and during those months, Ed Patton visited his aunt every two or three weeks, but he never said anything to her "about why she made that will in his (Oliver Shelton's) favor."

The foregoing statement contains all the essential testimony bearing on the questions of testamentary capacity and undue influence.

I. No instruction was asked or given on the question of the testamentary capacity of Mrs. Shelton. Plaintiffs' instructions were predicated alone upon the theory of the undue influence of Oliver Shelton. There is not in the case any evidence, substantial or otherwise, tending to prove that Mrs. Shelton was not of sound and disposing mind and memory. If under the facts in this case, defendant Shelton had asked an instruction withdrawing from the jury the issue of testamentary capacity, it would have been the duty of the court to give it. And such an instruction would have made more clear to the jury that the only issue was undue influence, upon which issue alone, plaintiffs went to the jury. [Bushman v. Barlow, 316 Mo. 916, 292 S. W. 1030; Meyers v. Drake (Mo. Sup.), 24 S. W. (2d) 116, l. c. 121, and cases there cited.]

II. Appellant, Shelton, contended in his motion for a new trial and he urges here that the trial court should have given the demurrer, asked at the close of plaintiffs' case, which was also the close of the whole case. He also insists that the court should not have given plaintiffs' instruction on the presumption of undue influence. Inasmuch as defendant Shelton did not see fit at the close of plaintiffs' case to offer any proof in rebuttal and in fortification of his own prima-facie case, it should follow that if the rule of presumption of undue influence applies, the demurrer was properly overruled. It thus appears that the correctness of the order overruling the demurrer in part at least turns upon the propriety of the application of the presumption.

III. Although the pleadings make up an issue whether the "paper writing purporting to be the last will and testament of the said Nannie Shelton deceased is her last will or not," and although such issues are triable before juries, trial courts in Missouri may say whether there is substantial evidence to sustain an issue of want of testamentary capacity, or of undue influence or of fraud and conspiracy in the procurement of the execution of a will in suit. And in so saying our courts may direct a verdict one way or the

other on the issue raised based on the uncontradicted testimony or absence of proof of the issue. In these respects will contests are but ordinary actions at law. [Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S. W. 46; McFadin v. Catron, 138 Mo. 1. c. 213, 227, 38 S. W. 932, 39 S. W. 771; Story v. Story, 188 Mo. 1. c. 129, 86 S. W. 225; Bradford v. Blossom, 207 Mo. 177, 105 S. W. 289.] In passing judgment upon the action of the trial court in over-ruling the demurrer in this case this court should give to the plaintiffs "the benefit of every inference which a fair-minded jury of ordinary intelligence might legitimately draw from the evidence." [Bushman et al. v. Barlow et al., 316 Mo. 916, 292 S. W. 1039, citing Van Raalte v. Graff, 299 Mo. 1. c. 525, 253 S. W. 220; Burton v. Holman, 288 Mo. 70, 231 S. W. 1. c. 633; Whittlesey v. Gerding (Mo. Sup.), 246 S. W. 1. c. 311; Ard v. Larkin (Mo. App.), 278 S. W. 1068.] But the plaintiffs' evidence which we must believe in ruling the demurrer must be of a nature to give substantial proof of their contentions. "Forced and violent inferences not flowing from a reasonable interpretation of the facts shown the demurrant is not required to admit." [Bushman et al. v. Barlow et al., supra; Williams v. Railroad, 257 Mo. 1. c. 112, 165 S. W. 788, 52 L. R. A. (N. S.) 443; Van Raalte v. Graff, 297 Mo. 1. c. 526, 253 S. W. 220.] And by parity of reasoning, the question of the application of the presumption of undue influence should be determined within the like latitudes and under the same limitations.

IV. By undue influence is meant an influence that restrains, controls, directs and diverts or coerces and overcomes and confuses the mind and the judgment of one making a will. [Bushman v. Barlow, supra; Hayes v. Hayes, 242 Mo. 155, 145 S. W. 1155; Winn v. Grier, 217 Mo. 420, 117 S. W. 48; Nook v. Zuck, 289 Mo. 24, 233 S. W. 233; Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S. W. 46; Myers v. Hauger, 98 Mo. 433, 11 S. W. 974; Doherty v. Gilmore, 136 Mo. 414, 37 S. W. 1127; Schierbaum v. Schemme, 157 Mo. 1, 57 S. W. 526; Tibbe v. Kamp, 154 Mo. 1. c. 579, 54 S. W. 879, 55 S. W. 440; Wood v. Carpenter, 166 Mo. 465, 66 S. W. 172; Crowson v. Crowson, 172 Mo. 702, 72 S. W. 1065; McFadin v. Catron, 120 Mo. 252, 25 S. W. 506.]

V. Measured by the foregoing standards, the demurrer, if it were to be judged apart from the presumption of undue influence, should be held to lie in this case. It is true that undue influence need not and indeed in most cases it cannot be shown by direct evidence. Therefore it may be proved and often it is proved indirectly by inference from other

facts in the case. But as said in Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S. W. 46, l. c. 51:

"It must not rest on mere opportunity to influence, or on mere suspicion. There must be somewhere proof of undue influence itself either in fact or presumptively. To be effective, it ought to be sufficient to destroy the free agency of the deceased at the time of making the will. It must not be merely the influence of natural affection; for affection is a stream that presumably flows at all times and its waters are under no ban known to the law. There must be present, and in active exercise overpersuasion, coercion or force, fraud or deception, breaking the will power of the testator."

There are not in this case either direct evidence or inferences reasonably drawn from evidence that Oliver Shelton "by his request, entreaties and influence over the mind of the said Nannie Shelton prevailed upon her to make" the will in suit, or that he "did by words, acts and entreaties towards her unduly influence and prejudice the mind" of Nannie Shelton against the plaintiffs and the minor defendant Susie Mae Ellis. But it is quite clear that the trial court did not pass upon the demurrer with the aid alone of the light of the evidence and its reasonable inferences seen with the naked eye as it were. Instead, the court reviewed the whole case through the telescope or more properly perhaps the periscope of the presumption of undue influence arising out of confidential and fiduciary relations between testatrix and defendant Shelton. And if the court was warranted in this case in applying to the judicial eye the periscope of the presumption, it ruled the demurrer rightly. Let us then consider whether the presumption lies in this case.

VI. The doctrine is firmly established in Missouri that when, in a statutory action to contest the validity of a will or in an equitable suit to set aside a conveyance, a confidential and fiduciary relation is shown to exist between the testator and the beneficiary under the will, or between the grantor and grantee in the deed, a presumption of undue influence arises and the burden shifts to the proponent of the will or to the grantee in the deed to overcome that presumption. [Cornet v. Cornet, 248 Mo. 184, 154 S. W. 121, and cases there cited; Hershey v. Horton (Mo. Sup.), 15 S. W. (2d) 801.] But the question when and under what circumstances the presumption may rightfully and justly be invoked is hard to answer in most cases. As is said in Hershey v. Horton (supra) "it is difficult if not impossible to deduce any hard-and-fast rule from the decided cases." What is the general nature of facts and relations of parties which govern the application of the presumption? The essence of the confidential relation is its fiduciary character, of which we read in 25 Corpus Juris, pages 1118, 1119, 1120:

"FIDUCIARY RELATION.—a. In General. It is difficult to define the term 'fiduciary relation;' it is a very broad one.

"b. When It Exists. It is a relation in which, if a wrong arises, the same remedy exists against the wrongdoer on behalf of the principal as would exist against a trustee on behalf of the *cestui que trust*. The relation may exist under a great variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith, and with due regard to the interests of the one reposing the confidence. It arises wherever a trust, continuous or temporary, is specially reposed in the skill and integrity of another, or the property or pecuniary interest, in the whole or in a part, or the bodily custody of one person is placed in the charge of another. Courts of equity have refused to set any bounds to the circumstances out of which a fiduciary relation may spring. It not only includes all legal relations, such as attorney and client, broker and principal, executor or administrator, and heir, legatee, or devisee, factor and principal, guardian and ward, husband and wife, partners, principal and agent, trustee and *cestui que trust*, but it extends to every possible case in which a fiduciary relation exists in fact and in which there is confidence reposed on one side and resulting domination and influence on the other. However, it is not every guardian, attorney, or priest, *quia eo nominee,* who is to be adjudged to hold a fiduciary relation with the party in regard to a particular subject; in some relations there must exist confidence of the one in the other, together with conditions extending to the one an advantage over the other, and this may be by reason of the superior intelligence of the one over the other or a superior knowledge. of the facts involved in a business transaction. It is not necessary that the relation and duties involved be legal; they may be either moral, social, domestic, or merely personal. The origin of the confidence and the source of the influence are immaterial."

Pomeroy in his treatise on Equity Jurisprudence (3 Ed.) vol. 2, secs. 956, 1147, 1148, states the general principle in the same broad terms, and concludes: "Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is. confidence reposed on one side and the resulting superiority and influence on the other."

The presumption under discussion is an equitable remedy, and it is to be used or not according to the facts in each case. And this is true, whether it be a suit in equity to set aside a conveyence, or a statutory action to contest the validity of a will. The one is

tried before the court sitting as a chancellor and the other before the court, of which the jury is an essential part. But in either case the trial court must determine as a matter of law whether the presumption applies.

But, although the Missouri cases, if hastily scanned or given a surface reading, may present an apparent inconsistency, which but arises out of the elasticity of the rule itself, they reflect certain fairly firm standards for the application or rejection of the presumption of undue influence in a given case. Among the cases which show when Missouri courts have applied the equitable doctrine of the assumption of undue influence, with the consequent shift of the burden of proof and when they have refused to make such application, are the following: Dingman v. Romine, 141 Mo. 466, 42 S. W. 1087; Coldwell v. Coldwell (Mo. Sup.), 228 S. W. 95; Bradford v. Blossom, 190 Mo. 110, 88 S. W. 721; Ib., 207 Mo. 177, 105 S. W. 289; Jones v. Thomas, 218 Mo. 508, 117 S. W. 1177; Cook v. Higgins, 290 Mo. 402, 235 S. W. 807; Roberts v. Bartlett, 190 Mo. 680, 89 S. W. 858; Gay v. Gillilan, 92 Mo. 250, 5 S. W. 7 (where the son preferred in the will terrorized his father, the testator); Mowry v. Norman, 204 Mo. 183, 103 S. W. 15, 122 S. W. 724; Hershey v. Horton, 322 Mo. 484, 15 S. W. (2d) 801; Maddox v. Maddox, 114 Mo. 35, 21 S. W. 491; Teckenbrock v. McLaughlin, 209 Mo. 503, 108 S. W. 46; Bushman v. Barlow, 316 Mo. 916, 292 S. W. 1030; Denny v. Hicks (Mo. App.), 2 S. W. (2d) 139; Wiegmann v. Wiegmann (Mo. App.), 261 S. W. 758; Knadler v. Stelzer (Mo. Sup.), 19 S. W. (2d) 1054; Elzea v. Dunn, 297 Mo. 690, 249 S. W. 933; Cornet v. Cornet, 248 Mo. 184, 154 S. W. 121; Barkley v. Cemetery Assn., 153 Mo. 300, 54 S. W. 482; Ryan v. Ryan, 174 Mo. 279, 73 S. W. 494; Martin v. Baker, 135 Mo. 496, 36 S. W. 369; Spurr v. Spurr, 285 Mo. 163, 226 S. W. 35; Lindsay v. Shaner, 291 Mo. 297, 236 S. W. 319; Rayl v. Golfinopulos (Mo. Sup.), 233 S. W. 1069; Turner v. Anderson, 236 Mo. 523, 139 S. W. 180; Nook v. Zuck, 289 Mo. 24, 233 S. W. 233.

From these cases it is clear that in every instance of a confidential and fiduciary relation of a nature that calls into action the presumption of undue influence there are two persons one of whom is subservient to the dominant mind and will of the other by reason of the age, state of health, illiteracy or mental debility of the subjected one. Since all of these cases concern property passing by deed or by will there are also present in every case land, funds, a going business or other things of value, which belong to the subservient one, but which often are possessed or managed by the controlling person. In some cases the person of influence with the owner merely advises concerning the property. We find in many of these cases also a control of the subject person by the other, due to the age or mental or physical debility of the one having the

power of disposition of property. And then there are the cases in which the one who stands to derive benefit takes a "pernicious activity" in the preparation and execution of the deed or will in controversy and in the persuasion of the grantor or testator to make the desired disposition of his property.

Respondents had in mind some or all of these elements of a confidential or fiduciary relation which assumes undue influence, when they drafted the given instruction on presumption of undue influence. The hypothetical part of the instruction reads:

"The court instructs the jury that if you believe and find from the evidence in the cause that at the time of the making of the paper purporting to be the last will and testament of Nannie Shelton, deceased, that the defendant, Oliver M. Shelton, was no blood relation of Nannie Shelton; that the plaintiffs in this cause, together with the defendant Susie Mae Ellis, were nephews and grandnephews and grandnieces of the said Nannie Shelton, deceased; and if you further find from the evidence in the cause that the said Oliver M. Shelton had for some time prior to the making of said purported will ·been living in the home of the said Nannie Shelton, deceased, and that the said Nannie Shelton had for years been afflicted and sick, crippled and unable to walk; and that the said Oliver M. Shelton took control of the home of the said Nannie Shelton and lived with her alone, transacted her business in purchasing the groceries and attending to the home, was nursing and caring for her, and that the said Nannie Shelton had implicit confidence in the said Oliver M. Shelton; and if you further find that the said Oliver M. Shelton was the sole beneficiary under said purported will and in addition thereto was appointed executor thereof and requested not to be required to give bond; that he had taken an active part in and about causing said paper writing to be prepared and in its execution, such as employing or aiding in the employment of the draftsman of said will, securing witnesses therefor, then the law presumes that said purported will is the result of undue influence on the part ·of said Oliver M. Shelton over the said Nannie Shelton."

In several respects the instruction gives a somewhat forced and violent inference to the hypothesized facts, as for instance in the matter of the control of Mrs. Shelton's home, and in the matter of transacting her business "in purchasing the groceries." But defendant Shelton's motion for a new trial in the court below and his assignments of error here cause the case to stand or fall upon the proposition that the demurrer should have been given and that the instruction on the presumption of undue influence should not have been given in any form, it being fundamentally erroneous.

In this case there are circumstances, trivial in themselves standing alone, which, taken together in all their verity and power of

influence, seem to warrant the application of the presumption of undue influence. The truth and adverse meaning of these facts are not offset by any proof by defendant Shelton to the contrary. He waived his right to rebut the case of plaintiffs, although by his proof he might have put to flight the presumption. He rested upon the prima-facie case in the first instance. And when he so rested, there were in the minds of the court and jury the facts of his fortune-seeking visit to Jonesburg, aided by the visions of a fortune-teller; his conversation with Mr. Reeds in which Shelton said to the friend and adviser of the afflicted woman that it might be worth his while "to assist me in getting her to make a will," and Shelton's visit to Judge Hughes' office. It is true, as said in Knadler v. Stelzer, 19 S. W. (2d) 1054, l. c. 1059, concerning a like journey by a messenger to a lawyer's office for an afflicted man that "no particular significance can be attached to these circumstances." But in the instant case, the testimony of Judge Hughes shows that defendant Shelton knew what Mrs. Shelton wanted in her will and that she desired information as to what she should do with the will after it was executed. These facts disclose that Oliver Shelton had discussed with Mrs. Shelton, or she with him, the wisdom of making a will, its terms and its place of custody. Obviously he had a conference with her about her will after Mr. Reeds had rejected Shelton's suggestion to influence her in making a will in his, Shelton's, favor. And unlike other cases in which these activities were present, we have not the benefit of Oliver Shelton's version or explanation. He rested when the demurrer was overruled. He did not fortify his prima-facie case.

Finding no prejudicial error, the judgment is affirmed. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All of the judges concur.